## THE COTTON PLANT.

A capture made within the State of North Carolina on the Roanoke River, 130 miles from its mouth, by a naval force detached from two steamers that had proceeded up the river, one about 80 miles and the other about 100, where they stopped in consequence of the crookedness of the stream and apprehensions of low water, held to be a capture upon "inland waters" of the United States, as that phrase is used in the act of Congress of July 2, 1864 (13 Stat. at Large, 377), and therefore not to be regarded as maritime prize.

APPEAL from the District Court for the Eastern District of Pennsylvania, condemning as prize the steamer Cotton Plant, and her cargo; the case was thus:

An act of Congress of July 2, 1864, passed during the late rebellion, enacts that " no property seized or taken upon *any* of the inland waters of the United States by the naval forces thereof shall be regarded as maritime prize;". and directs that all property so seized or taken shall be promptly delivered to the officers of the courts, to be dealt with in a way which the act prescribes.

The capture, which was the subject of this libel, took place on the 10*th day of May*, 1865, in North Carolina, at the mouth of Quankey Creek, on the Roanoke River, about half a mile

below Halifax, and about 130 miles above Plymouth, which lies at the mouth of the river, where the river falls into Albemarle Sound; the river at that point being narrow and shallow. An expedition, consisting of the United States steamers Ioscoe and Valley City, with a picket launch, went up the Roanoke River. The Ioscoe proceeded to Hamilton, which was 50 miles from the place of capture; the Valley City went up the river to a point 32 miles from the place of capture; both vessels stopping at the places where they did. on account of the winding course of the stream and from fear of getting aground. An officer and six men were placed on the picket launch, attended by an armed crew from the Ioscoe. The launch, with these crews, proceeded up the river to the place of capture, and there seized the steamer with her cargo then on board, cotton chiefly, and putting on her some other cotton that they brought from a barn on land, recently landed from this same steamer and put in the barn for temporary safe keeping until reladed, sent her to Philadelphia, where she was libelled in the District Court and condemned, as already mentioned.

Her owners appealed to this court. There was no allegation of any breach of blockade.

*Messrs. W. L. Hirst and T. R. Elcock, for the appellants:*

It is matter of public history that Lee surrendered on the 9th day of April, 1865; Johnston, on the 26th day of the same month; and that thus ceased all hostilities and opposition to the United States, in Virginia and North Carolina. How, in the face of such facts, can the Cotton Plant, *on the 10th of May following all this,* have been the subject of lawful capture as prize under *any* circumstances?

But situated where she was, the steamer was not a subject for prize even if war had still been flagrant. The entire expedition by the picket launch was a *raid* rather than a lawful act of war. The act of July 2d, 1864, is conclusive; declaring as it does, that no property taken, upon any of the "*inland waters*" of the United States by the naval forces shall be regarded as maritime prize, and provides, as it also

does, another system for all such seizures. "*Inland*" means "*remote from the sea.*" In the case of *Mrs. Alexander's Cotton,*[*] the cotton was captured much as some of this was, on the Red River, a few miles above the point where it enters the Mississippi. This court declared that it could not be the subject of a libel as maritime prize, but should have been turned over to be treated as captured and abandoned property under the statutes of 1863 and 1864. It follows that the court below had no jurisdiction. The steamer and her cargo should have been "*promptly*" handed over to the agent of the Secretary of the Treasury. Want of jurisdiction in the court below, however, does not prevent this court from assuming jurisdiction on appeal for the purposes of reversing the decree rendered by the court below, and of vacating its unwarranted proceedings.[†]

*Mr. C. H. Hill, Assistant Attorney-General, for the United States ; Mr. Ashton, for the captors, contra :*

Although Generals Lee and Johnston had surrendered in April, 1865, General Richard Taylor did not surrender Mobile till May 4th, six days before this capture, and General Kirby Smith did not surrender until after it, May 23d. These are public historical facts, known to all and of which the court takes notice. War, therefore, still existed, and this capture, to use the words of Lord Tenterden, was "a hostile seizure, made, if not *flagrante*, yet *nondum cessante bello.*"[‡]

The Roanoke River, where the capture was made, was not "inland waters" within the act of July 2d, 1864. It is a short navigable river, flowing directly into tidal waters. The term "inland waters" has been generally considered as applying to the lakes or to the immense rivers like the Missouri, Mississippi, Ohio, &c., which have their courses a thousand miles from the sea. To come within the act all the waters should be "inland." But water which runs directly into the sea is not "inland," though the term may

---

[*] 2 Wallace, 204.          [†] Morris's Cotton, 8 Id. 507.

[‡] Elphinstone v. Bedreechund, 1 Knapp, 316.

apply to such waters as flow into other waters that do discharge themselves into the sea.

This case is different from that of *Mrs. Alexander's Cotton.* That was cotton seized wholly on land and which grew on the plantation where it was deposited. No maritime capture was made with it, and there was nothing to distinguish it from any other property on land which is ordinarily exempt from condemnation as prize. The Red River, on whose banks that seizure was, enters the Mississippi at a distance of 334 miles from the sea.

Mr. Justice STRONG delivered the opinion of the court.

Whether the steamer Cotton Plant and her cargo of cotton were subject to lawful capture when seized, is a question that need not now be considered; for if it be conceded that they were, we are still of opinion that they were not liable to condemnation as maritime prize. The capture was made within the State of North Carolina, on the Roanoke River, and about one hundred and thirty miles above its mouth. It was made by a naval force detached from two steamers that had proceeded up the river from Albemarle Sound, one about eighty, and the other about one hundred miles, where they stopped, in consequence of the crookedness of the stream and apprehensions of low water. A picket launch, with a crew of six men, and two other boats' crews, were then sent forward, and they effected the capture. It was, therefore, an inland capture, though made upon a river which empties into an arm of the sea, and it was at a point where ordinary vessels of war could not safely go. There was nothing in the situation of the property that required peculiarly a naval force or maritime service to effect its capture. The seizure might as well have been made by a detachment from the army, as by one from the navy. It appears to us, therefore, that in view of the legislation of Congress, the property cannot be regarded as a maritime prize. By the seventh section of the act of July 2d, 1864,*

---

* 13 Stat. at Large, 377.

it was enacted "that no property seized or taken upon any of the inland waters of the United States by the naval forces thereof, shall be regarded as maritime prize; but all property so seized or taken shall be promptly delivered to the proper officers of the courts (or) as provided in this act, and in the said act approved March twelve, eighteen hundred and sixty-three." The language of this section is very comprehensive. It embraces *all property* seized or taken by the naval forces upon *any* of the inland waters of the United States. It would be difficult to give any reason for holding that the part of the Roanoke River upon which the Cotton Plant was seized is not described by the phrase "any of the inland waters of the United States," as understood by Congress. The river is wholly inland. It is true that it discharges its waters into Albemarle Sound, and that it is accessible directly from the ocean. But, in speaking of inland waters, Congress must have intended waters, within land indeed, yet waters where a naval force can go, and where naval captures could be made. And it is obvious that other waters than those of the great lakes were contemplated and designed to be included. The act was passed during the war of the rebellion, and it was part of a system devised for securing captured and abandoned property in States and districts declared to be in insurrection by the President's proclamation of July 1st, 1862. There was no war upon the lakes, and they were not within insurrectionary districts. If, therefore, the act does not apply to rivers, and to rivers accessible from the sea, upon which naval captures could be made, it could never have had any practical effect. But if it applies to captures upon rivers, what reason can there be for confining its operation to seizures by the naval forces upon rivers that run directly into the sea? The act speaks of captures upon *any* of the inland waters of the United States. It makes no distinction between rivers that run directly into the sea, and those that flow into others that discharge into the sea. If any distinction exists it is purely arbitrary and judicial, rather than legislative. Both classes of rivers are inland waters; equally such. Maritime service

can be no more meritorious or efficient upon one than upon the other. In the absence of express legislative enactment to that effect, no satisfactory reason can be given why a vessel captured on the Red River five miles above its junction with the Mississippi should be turned over to the courts to be treated as captured and abandoned property under the statutes of 1863 and 1864, which does not apply to a capture made on the Mississippi itself, five hundred miles farther from the Gulf of Mexico. Congress probably anticipated, especially in view of the state of the war when the act was passed, that most of the captures on the rivers would be made by the army, and thought it unwise to continue two modes for the disposition of the property taken.

Such being our opinion of the meaning of the seventh section of the act of July 2d, 1864, we must hold that the property captured and condemned in this case ought not to have been regarded as maritime prize, and subject to condemnation as such.

The decree of the District Court is therefore REVERSED, and the case is remanded, in accordance with the rule stated in *United States* v. *Weed*,* for further proceedings, if the government shall see fit to institute them.