BLOUNT, sheriff, *et al. vs.* MUNROE.

[This case was argued at the last term and the decision reserved.]

Timber at the port of Darien, being shipped and awaiting shipment, belonging to, and in the hands of, a subject of Great Britain, resident in Darien, Georgia, a part of the year, for the sole business of exporting timber to England, and under contract of sale to parties in England, on the 1st of April, 1875, and actually exported, most of it before the 1st of July, when the exporter was required to return it

for taxes, and every log of it by the 1st of November, and thus segregated from the mass of property in the state on the 1st of April, 1875, and its situs as an export fixed at that time, when, if at all, it was taxable, was not intended to be taxed by the law of Georgia taxing all property *ad valorem* but expressly excepting all property exempted by the constitution of the United States; and, if so intended, the act would be void, under the prohibition of the second paragraph of the tenth section of the first article of the constitution of the United States, which prescribes that "No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws, etc."

Taxes.    Laws.    Constitutional    law.    Before    Judge
TOMPKINS.    McIntosh    Superior    Court.    November    Term,
1876.

. Reported in the opinion. .

R. N. ELY, attorney general ; W. A. WAY ; R. E. LESTER, for plaintiffs in error.

HARTRIDGE & CHISHOLM, for defendant.

JACKSON, Judge.

D. M. Munroe filed his bill in the superior court of McIntosh county, to restrain sheriff Blount, and the tax collector, McDonald, from selling his property to satisfy a tax *fi. fa.* for state and county taxes, on the ground that the property assessed and double taxed was exempt from state taxation under the constitution of the United States. They answered the bill, and took issue thereon. The whole case was submitted to the judge of the superior court, as chancellor, without a jury, under an agreed state of facts, who granted a decree for a perpetual injunction against the execution ; and the sheriff and collector excepted thereto, and bring the case here for review.

The following are the facts agreed upon : "Donald M. Munroe is an alien, and a subject of Great Britain. He has

been, for several years, engaged in the business of purchasing timber for European markets, and shipping the same to their respective places of destination. He is not engaged in the business of selling timber in the United States. He has, upon one or two occasions, furnished small quantities of timber to his fellow timber merchants in Darien, at cost prices, to enable them to complete orders and shipments. All the timber in his possession, on the 1st of April, 1875, has been exported, and all of it was exported before the 1st of November, 1875—the most of it before the 1st of July, 1875. All of said timber was under contract of sale before the 1st of April, 1875, and was, on that day, in process of shipment, and awaiting shipment, to the kingdom of England. The complainant refused to return the timber for taxation, and the value of the timber, in his possession, on the 1st of April, 1875, was assessed by the receiver, and the tax *fi. fa.* was issued for double tax on said timber so assessed. The complainant purchased the timber which was in his possession on the 1st of April, 1875, in rafts. None of these rafts were broken and parts of them sold in the United States ; all of them were exported.

The family of the said complainant resides in England, and he lives a portion of each year in Darien, Georgia. The timber is not exported in rafts, but has to be broken before exportation. The timber was cut in Georgia, and sold by citizens of Georgia to complainant. The timber was delivered alongside of the ships in rafts. The ships afterwards break the rafts, and store the timber as best suits the ships. The ships were loaded in the port of Darien."·

Under the tax laws of the state, all property in possession of the owner on the 1st of April, 1875, is subject to pay an *ad valorem* tax.· No specific tax was imposed upon timber, either remaining in the state for sale here, or sent to the markets of the United States, or for export to foreign nations. No impost or duty, properly so called, was laid upon this exporter or his exports, or attempted to be laid thereon. A general tax, *ad valorem*, was laid upon property, and this

timber was assessed and the property, real estate of Mr. Munroe, was levied upon to pay the tax so assessed against him for this timber.   So that the naked question is, can a tax of the state, of the same sort and at the same rate as upon all other property, be laid upon this timber under the constitution of the United States? or, is this timber exempt from such taxation under the constitution of the United States, as being an export?

The constitution of the United States, article I, section x—Code, §5189, declares that "No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any state on imports or exports shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and the control of the congress." Then, in the same section, follows the provision that no state shall, without consent of congress, "lay any duty of tonnage," etc., etc.

A question might well arise whether, by this clause of the constitution, such a tax, as a general tax like this laid equally upon all property in the state, is within the prohibition of the constitution of the United States.   But it has been virtually settled by adjudication by the supreme court of the United States, which is, of course, the supreme authority on all questions of this sort, and we must yield to its authority.   The current of opinions and adjudications in that court seems unbroken, that, whether the tax be specific or general, whether upon imports or exports alone, or upon all property and these embraced therein, or whether the article be taxed *ad valorem*, like everything else is taxed, or differently and specifically, the imposition is obnoxious to the prohibition, because, if the power to tax be conceded, the limit is within the discretion of the legislature.   12 Wheaton, 425, 440, 444; 24 Howard, 169; 2 Otto, 620; 13 Wallace, 29; 8 Wallace, 130.

Whether the reasoning on which these adjudications rest

be sound or not, it is not for us to inquire; as we have no power to enforce our views should they be variant from those of the supreme court of the United States.

The question, therefore, seems narrowed to this point: was the timber which was double taxed by the collector an "export," in the sense of the constitution of the United States, on the first day of April, 1875?

In the case of imports, it has been settled by the supreme court of the United States, that the states can levy no tax upon the thing imported while in the hands of the importer, and before the package is broken for distribution into the mass of the property in the states—12 Wheaton, 419; 5 Howard, 576; 8 Wallace, 123, 148, and 13 Wallace, 29.

By analogy, it would seem that this timber was an "export," in the sense of the constitution, on the 1st of April, 1875. It was then in the hands of an exporter, engaged in that business alone; it was being shipped, and waiting for shipment, and under contract for sale to persons in England; it was afterward all shipped; it was most of it shipped before the first of July, when the tax receiver notified the exporter to return it for taxes, and every log of it by the first of November following. So that, unless to become an export in the sense of the constitution, it must be actually placed on board ship, it is difficult to see what more could be required to segregate it from the mass of property in the state, and designate it clearly as an export. It was in the port whence it was to be shipped, and in the hands of the foreign merchant, whose sole business was to ship it, and it was ready to be placed alongside the ships as they arrived to take it aboard as best suited them. The exporter had done all *he* could do; for it were folly to require him to move it out into the water from alongside the shore until the ships came to be laden with it, and the custom of the trade was to move it in rafts, just as it was, to the ships, and for them to break the rafts and load as they wished.

It cannot be the meaning of the clause of the constitution that it becomes an export when on shipboard, and not,

before; for the exception in respect to the inspection laws shows that such is not the meaning—those laws being almost always, if not always, without exception, executed on land before shipment. So we conclude that this lumber was, in the sense of the constitution, as construed by the supreme court of the United States, an export on the first of April, 1875.

But it is doubtful if the general assembly meant to tax it at all. Section 798 of the Georgia Code exempts from taxation all property exempt by the constitution of the United States and of the state. The tax act, which the tax authorities of McIntosh county undertook, in 1875, to stretch over this case, was a general tax, *ad valorem* on all property; the previous custom of the executive department had been not to tax this sort of lumber, under laws similar to the act under which these officers were proceeding; and, as decided at this term, in the case of *Miller vs. Wilson*, not yet reported, the meaning of a tax act may be gathered from the custom of the executive department. We think, therefore, that the legislature did not mean to tax it; that it was not embraced in the act, and that, therefore, all presumptions in favor of the constitutionality of acts of the legislature do not apply. But if it had been taxed expressly, and without discrimination, as respects other property in the state, we should be constrained, under what we regard to be the principle frequently affirmed by the supreme court of the United States, to hold the tax to be in conflict with the constitution of the United States. Imports and exports are embraced in the same clause of the instrument; both are connected directly with commerce—foreign and inter-state; and it seems to us proper to apply to the one the same general rule of construction which has been applied to the other.

And in the case of Almy *vs*. California, 24 Howard, 169, the principle seems to have been applied to exports in a case, however, not exactly analogous to this, but where a specific tax was laid upon gold exported from California to the eastern states, by taxing the bill of lading therefor—differ-

ing from this in the facts that it was specific, and affecting the export only, and that it was inter-state and not foreign; but that case goes far to show that exports are classed with imports in the construction placed on the clause in question; and applying the principles deduced from the decisions on imports to exports, as far as applicable, we think this case must be controlled by the adjudication made in the California case, and in the cases on imports—construed together.

There is another view which may be taken further to strengthen the position we feel constrained to take in respect to this tax. Suppose that instead of this timber having been cut in Georgia woods, it had been brought to Darien from Tennessee, or some other interior state, cut from the woods of such state, and had been in the possession of this foreign merchant at the port of Darien for exportation, being shipped and awaiting shipment, and under contract of sale to dealers in England, will it be contended that Georgia could, in such a case, impose the tax? Would not the imposition of it, in the case supposed, be within the very reason and spirit of the constitutional prohibition as expounded by the framers of the constitution? This was the argument of Mr. Madison in the Virginia convention. He said, " Virginia exports the products of North Carolina; Pennsylvania, of New Jersey and Delaware; and Rhode Island, of Connecticut and Massachusetts. The exporting states wish to retain the power of laying duties on exports to pay them for the expenses incurred. The states whose products are exported by other states would be extremely jealous in case a contribution should be raised of them by exporting states;" and this he argues as the reason for the change. 3 Elliott's Debates, 483. See, also, 5 Madison Papers, 539. If this, then, would be the conclusion in such a case, wherein is the principle not applicable to the case at bar, though it be Georgia-grown timber that is the export? The constitution does not prescribe that no state shall levy such a tax on exports of articles brought *from other states* to her seaport towns, but simply and without exception, it lays the ban of

prohibition upon all exports.   If this lumber would be an export if brought from Tennessee, and lying in Darien under like circumstances as those which make its status now, it is an export, though it came from the woods of Georgia; and it is as obnoxious to the prohibition on Georgia to tax it in the one case as in the other.   It was put in the constitution, it is true, to check the power of the seaboard states, and to protect the interior states in the egress of their goods to the markets of the world; but when engrafted upon the constitution, to carry out the object had in contemplation, the clause was made general, so as to prohibit the states from taxing any export, and thus to prevent any trouble or uncertainty in ascertaining whence the product came—narrowing the investigation to the single question : is the article taxed an export?

It is true that it may be difficult to ascertain the precise point where the product of the same state ceases to be part of its common property and becomes an export; and it is, perhaps, hard, as Chief Justice Marshall, in the leading case on imports, found it to be, to draw the exact line; but it seems reasonable to hold, that where the article is in the hands of the exporter, at the port, part being shipped and the balance waiting shipment, and all contracted for sale abroad, and as soon as shipping could be procured, actually shipped, such articles had crossed the line. and were separated clearly from the mass of property in the state, and had thus become exports, not subject to be taxed, except for expenses of the inspection warranted by state law.

The opinion and decision in this case were withheld, at the request of the attorney general, in order that he might furnish a brief in the case in behalf of the taxing power of the state; and it affords me pleasure to say, that whilst he has not overcome the conclusion to which the court had arrived before his argument was submitted, he has evinced great research and learning, and much ability in urging the power of the state to tax in such cases as that at bar.   Controlled, however, by what we conceive to be the spirit and

tenor of the adjudications of the court of the last resort on analogous questions, and doubting whether our general assembly ever intended at all to tax such articles of commerce, ready for shipment, we concur in the able opinion of Judge Woods, in a similar case—Clarke & Co. *vs.* Clark *et al.*, in the United States circuit court at Savannah—and in that, equally able, of the court below, and affirm the judgment.

We are the better satisfied with the judgment we render, because section 793 of our Code distinctly exempts from taxation "all property specially exempted by the constitution of the United States." Inasmuch as no words used in the act taxing property, directly embraces anything like this timber, it would be a strained construction, in the teeth of the above paragraph from the Code, to say that the legislature meant to embrace it.

It is of doubtful policy, to say the least, whether it should be taxed, and the mind of the general assembly should clearly express their intention before the collectors undertake to enforce such a tax. It is to the interest of the state to encourage foreign commerce, and direct trade with Europe has long been a *desideratum* with the south. This subject of Great Britain, resident among us for a part of the year, should be encouraged and not harrassed, in the only business which brings his money to our shores—the export business—and, until the general assembly clearly molest him, by taxing that business, the policy of the courts is to throw around him all the guarantees of the constitution of the country, and, by protecting him, allure others to seek similar business here.

Exports bring back money, or products needed by us, in exchange, and the taxable property of the state is increased in bulk and value thereby; and thus the state really increases, rather than diminishes, her income from taxation.

For all these reasons, the judgment must be affirmed.