**STANDARD OIL CO. v. ATLANTIC COAST LINE R. CO.**

**SAME v. SEABOARD AIR LINE RY. CO.**

(District Court, E. D. North Carolina, at Raleigh. July 6, 1925.)

Nos. 498, 499.

Commerce ⬡⟾34—Interstate shipments of oil held terminated by storage, so that subsequent shipments were subject to state rates.

Interstate shipments of oil from company's refineries by its own vessels to its storage plant, to be there stored and reshipped to substations and to customers at such times and in such quantities as business should demand, *held* terminated by such stoppage and storage, so that subsequent shipments from such plant to points within state were subject only to intrastate rates; the stoppage being in good faith.

In Equity. Two suits for injunction by the Standard Oil Company, a corporation of New Jersey, one against the Atlantic Coast Line Railroad Company, and the other against the Seaboard Air Line Railway Company. Decrees for complainant.

Pou & Pou, of Raleigh, N. C., and George H. Tower, of New York City, for complainant.

Thomas W. Davis, of Wilmington, N. C., Murray Allen, of Raleigh, N. C., and Skinner & Whedbee, of Greenville, N. C., for defendant Atlantic Coast Line R. Co.

Murray Allen, of Raleigh, N. C., for defendant Seaboard Air Line R. Co.

MEEKINS, District Judge This is an action brought by the Standard Oil Company, a corporation of New Jersey, hereinafter called complainant against Atlantic Coast Line Railroad Company, a corporation of Virginia and a corporation of North Carolina, and Seaboard Air Line Railway Company, a corporation of Virginia and a corporation of North Carolina, hereinafter called defendants.

The complainant, a corporation engaged in the sale and distribution of gasoline and refined oils in North Carolina and other states, seeks a permanent injunction restraining the defendants from assessing other than their intrastate rates for the transportation of these products by railroad from Wilmington, N. C., to points in the state of North Carolina over intrastate routes· The sole question involved is whether this traffic is interstate or intrastate in character. There are two suits pending involving the same issue, which by agreement were consolidated and tried together.

Complainant refines gasoline and oils at its refineries at Charleston, S. C., Baton Rouge, La., Baltimore, Md., and other places, and carries the products in its own tank vessels to Wilmington and other ports along the Atlantic seaboard. At Wilmington it maintains an elaborate plant for the transfer of these commodities from the vessels, for the storage thereof, and for selling them to customers throughout the state of North Carolina. The Wilmington plant, which is located approximately one-third of a mile from the Cape Fear river, consists mainly of six large storage tanks, four for gasoline and two for refined oil, with an aggregate capacity of between 5,000,000 and 6,000,000 gallons, together with 23 small tanks for lubricating oils, two warehouses of brick construction, where various commodities are stored, and where some of the products are barreled.

The defendants serve the plant of the complainant with their own rails. Upon the arrival of a vessel the gasoline or refined oil is pumped into the storage tanks through various pipe lines maintained for that purpose, and the commodities are there held awaiting sale to complainant's customers or transfer to substations maintained by complainant in various parts of the state.

Distribution of these commodities from the Wilmington plant takes several forms. The principal movement is in tank cars leased to complainant by a private car company, but hauled in common carrier service by the defendants. Some shipments are made in barrels loaded in box cars. Defendants are not now charging, and have not sought to charge, interstate rates on these shipments; and other distribution is made by tank wagons to customers in Wilmington and nearby territory.

Wilmington is one station within the jurisdiction of what complainant designates as its Charlotte branch, which embraces most of the state of North Carolina. These stations are supplied not only from Wilmington, but, as occasion may require, from Norfolk, Va., Charleston, S. C., and other points at which complainant stores its products. A substation which to-day receives its supplies from Wilmington may to-morrow receive them from Norfolk. During the two years prior to the hearing there were 231 such "transfers" of stations from one supply point to another, and there have been as many as 35 such transfers at a single time. The executive offices of complainant in New York, N. Y., and Baltimore, Md., determine from time to time the source of supply for the several stations in the Charlotte branch; this matter

not being within the jurisdiction of the Charlotte branch manager or the manager of the Wilmington plant. This indicates that, when the products arrive at Wilmington, their destination is not definitely known, and this is confirmed by the testimony.

The quantity of these products handled annually through Wilmington is very large. The receipts at Wilmington during the year 1923 were over 39,000,000 gallons. From 250 to 300 cars of these products are shipped from Wilmington monthly. Complainant has between 15,000 and 20,000 customers in North Carolina, who receive these products chiefly through complainant's substations. Complainant has 136 "carload customers," to some of whom tank car shipments are made directly from the Wilmington plant, and others to whom delivery is made through the substations; the customer in this instance calling for the products with his own trucks.

In the state of North Carolina there are 550 "drive-in" service stations and about 1,-500 garages; only 2 per cent. of the total being owned by the complainant. There are between 9,000 and 10,000 small purchasers, such as grocery stores and hardware stores, who are supplied largely by truck from the substations or from the Wilmington plant. In 1922 over 200,000 gallons of refined oil were sold to the United States government, which moved over defendants' rails in the government's own tank cars. Of the tank cars shipped to complainant's own substations and to independent customers in 1923 from the Wilmington plant, 14 per cent. went directly to the independent customers. The quantity distributed locally from the Wilmington plant to nearby territory, largely by tank wagons and trucks, amounted to about 2,500,000 gallons in 1923.

It is apparent from the nature of the business that it is not known at any given time to what destination a particular quantity of these products will ultimately go. It is not until after an order is received at Wilmington that the destination of a particular shipment can be determined. At page 44 of the record the manager of the Wilmington plant stated: "I know when I receive this oil [at Wilmington]. I hold it in the warehouse and the tanks until I receive orders to ship it out." When the vessels leave Charleston or other refining point of complainant, it is not known to what ultimate destination any particular part of the cargo will, in the course of time, be shipped from Wilmington. The products are for the first time committed to a common carrier when shipped from the Wilmington plant to interior points in North Carolina.

At each of the substations in the state of North Carolina the complainant has small tanks for gasoline and other petroleum products, from which distribution is made largely in tank wagons to customers in the surrounding territory. Complainant's branch manager at Charlotte receives "stock reports" from time to time showing the quantities of the product on hand at the several substations, and when in his judgment it is desirable to do so he orders shipments to be made from Wilmington to the several substations. One of the objects of the Wilmington plant is to have the products on hand ready for use when and where needed.

The history of the rate adjustment shows that for nine or ten years prior to September, 1923, it was the custom of the defendants to apply intrastate rates on this traffic. Prior to 1914, both the state and interstate rates were on the same basis, with the result that no question arose at that time regarding the character of the shipments. On August 13, 1914, the then Governor of the state of North Carolina signed an order requiring the railroads in North Carolina to make effective within 60 days an intrastate basis of rates which were in some instances lower than the corresponding interstate rates. The railroads promptly complied with this order, and the railroads continued to apply the intrastate basis of rates from October, 1914, to September, 1923, when, to use the words of one of their witnesses, the defendants in this case "apparently concluded that they were entitled to collect on the interstate basis."

The record shows that the receipts of gasoline and refined oils at Wilmington are quite irregular, varying widely from month to month. In June, 1923, for example, the gasoline receipts were nearly 5,000,000 gallons, whereas in October they were less than 2,000,000. In January, 1923, the receipts of refined oil were about 500,000 gallons, while none were received in February, and in March there were received over 1,000,000 gallons. Marketing and business conditions govern complainant's executives in determining whether the stocks at Wilmington should be kept high or low. This matter is not within the jurisdiction of any of the complainant's representatives in North Carolina. The Baltimore office of complainant is kept advised of the situation, because the branch manager at Charlotte makes regular reports to the division manager at Baltimore of the sales in the Charlotte district, and

complainant's Wilmington agent, in like manner makes reports of his stock on hand to the branch manager at Charlotte, to the division agency at Baltimore, and to the New York office.

On May 1st of each year the complainant pays a local property tax upon the inventories of the Wilmington plant, including the gasoline, refined oils, lubricating oils, and other commodities on hand in the storage tanks and warehouse at that time, and this has been done for many years in the past. Complainant insists that these taxes could not be levied if the products, in contemplation of law, were moving in interstate commerce. Freight charges on the shipments from Wilmington are either prepaid by the complainant, or are paid by the customers or by the complainant's substations; but, when paid by the customers, the freight charges are deducted from the invoice, so that the complainant ultimately pays and bears the freight charges. The differences between the charges paid and those which could have accrued on the intrastate basis exceed $3,000 annually against each of the defendants.

The record shows that it is customary throughout the country to apply intrastate rates on articles which are jobbed from a warehouse to the surrounding territory within the state. If, therefore, the business of complainant, as conducted from the Wilmington plant, is essentially a jobbing business, there would seem to be no doubt that intrastate rates should apply. This involves, among other things, the determination of the question whether, in contemplation of law, the products come to rest at Wilmington. The fact that no destination other than Wilmington is definitely known when the products leave the refining point, and the fact that they are first committed to a common carrier for transportation at Wilmington, seem to leave no doubt that Wilmington is the point of shipment, so far as railroad transportation is concerned. The record shows that there is no arrangement for a continuous carriage between water line and rail line, and that the products come to rest at Wilmington under the exclusive control of the complainant, and that they are taxed as part of the property of the state of North Carolina.

It is contended by the defendants that the essential facts of the commerce establish a shipment, in legal contemplation, or the movement of the shipment as a practical business proposition establishes a shipment, that is continuous from the place of inception

6 F.(2d)—58

tion of carriage to the final points of retail distribution within the interior of the state of North Carolina, and is therefore, under the Constitution and laws of the United States, an interstate shipment or interstate commerce. Upon the other hand, it is contended by the complainant that the essential facts of the commerce establish a shipment into the state of North Carolina, to a port of entry therein at Wilmington, where complainant has an established business place, which business place consists of various large storage tanks, warehouses, terminal facilities, pumps, etc., essential for the storage and distribution of oil and gasoline; a place where the original interstate shipment comes to an end or rest, and, in legal contemplation, a final destination of the interstate shipment, begun by the complainant from Baton Rouge and Charleston, and that the subsequent reshipment or distribution of the same products, from Wilmington to other places within North Carolina, either to the complainant's agencies or to independent consumers, are new shipments and intrastate in character.

It is important in the first place to have a proper understanding and decision in this case, that we comprehend clearly the essential facts, and the proper statement of such facts makes obvious the question in controversy, and distinguishes this from or with the decided cases. As stated, the sole question at issue is: What is the proper legal demarcation between interstate and intrastate commerce, under the Constitution and laws of the United States? Does the original interstate shipment end and come to a commercial rest at Wilmington, and cease to be in commercial transit; or is the port of entry at Wilmington but a depot on the line of ultimate transportation to other points within the state of North Carolina?

The record does not disclose, by contract of the parties or other forms of arrangement between the parties, or any plan of operation of which it may fairly be said, that there exists an agreement or plan to evade any provision of law or to circumvent any legal rights of the defendants, but rather a method of shipment, storage, and distribution, appropriate to the large affairs of the complainant, and essential to the management and success of that business.

For the defendants, it may be urged with equal force that, if the arrangement here established should be established, as it likely will be, by other large producers and distributors of trade, through the use of a central storage plant, warehouse, etc., within

a state, and the subsequent reshipment, immediately or remotely, as the demands of the particular trade may require, to other places of retail consumption within the same state, that then in the like cases interstate commerce will end at the central point. Interstate commerce will be confined to shipments through the states, or from without the states to such central points of distribution.

For the defendants it may be further urged that interstate commerce should be extended to its furthest limits; that the commerce clause of the Constitution of the United States should be construed to embrace an all-sweeping and pervading power, stopping at no object of legislative or administrative control, that would ultimately and inevitably destroy the sovereignty of local self-government within the respective states, and that no arrangement of extensive business, demanded by the necessity of modern life, harmless in a proper reconciliation of federal and state authority, should be allowed to prevail.

This court, speaking from the federal forum and believing in the extension of federal power to its ultimate, but proper, limit, believes it to be an imperative duty, binding with equal obligation and solemnity on federal and state court, to protect with equal zeal the true boundaries of federal and state jurisdiction. The demarcation between interstate and intrastate commerce is often difficult of exact definition, but in certain concrete cases, decided by the Supreme Court of the United States, the line has been established along principles.

In one of the leading and latest cases on the subject, decided by the Supreme Court of the United States, B. & O. Southwestern Railroad Co. v. Settle et al., 260 U. S. 166 et seq., 43 S. Ct. 28, 67 L. Ed. 189, Mr. Justice Brandeis, speaking for the court, says:

"The rights of shipper against carrier are determined by law through the provisions of the tariff, which are embodied in the applicable published rate, * * * and whether the interstate or intrastate tariff is applicable depends upon the essential character of the movement. That the contract between shipper and carrier does not necessarily determine the character was settled by a series of cases in which the subject received much consideration. * * * This court held that a carrier cannot, by separating the rate into its component parts, charging local rates and issuing local waybills, convert an interstate shipment into intrastate transportation, and thereby deprive a shipper of the benefit of an appropriate rate for a through interstate movement. * * * The intention as it was carried out determined, as matter of law, the essential nature of the movement. * * * For neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk is an essential of a through interstate shipment. These are common incidents of a through shipment; and when the intention with which a shipment was made is in issue, the presence or absence of one or all of these incidents may be important evidence bearing upon that question. But where it is admitted that the shipment made to the ultimate destination had at all times been intended, these incidents are without legal significance as bearing on the character of the traffic. For instance, in many cases involving transit or reconsignment privileges in blanket territory, most or all of these incidents are absent, and yet the through interstate tariffs apply."

Mr. Justice Brandeis then takes up the other view, or a view from the intrastate standpoint, and says in the same case:

"The mere fact that cars received on interstate movement are reshipped by the consignee, after a brief interval, to another point, does not, of course, establish an essential continuity of movement to the latter point. The reshipment, although immediate, may be an independent intrastate movement. The instances are many where a local shipment follows quickly upon an interstate shipment, and yet is not to be deemed part of it, even though some further shipment was contemplated when the original movement began. Shipments to and from distributing points often present this situation, if the applicable tariffs do not confer reconsignment or transit privileges."

In Chicago, Milwaukee & St. Paul Railway Co. v. State of Iowa, 233 U. S. 334, 34 S. Ct. 592, 58 L. Ed. 988, Mr. Justice Hughes, speaking for the court, says:

"It is undoubtedly true that the question whether commerce is interstate or intrastate must be determined by the essential character of the commerce, and not by mere billing or forms of contract. * * * But the fact that commodities received on interstate shipments are reshipped by the consignees, in the cars in which they are received, to other points of destination, does not necessarily establish a continuity of movement, or prevent the reshipment to a point within the state from having an independent and intrastate character."

In a later expression of the Supreme Court of the United States, in the case of Champlain Realty Co. v. Town of Brattleboro, Vermont, 260 U. S. 367, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195, Mr. Chief Justice Taft further and in a clear and graphic way distinguishes between the essential features of interstate and intrastate commerce.

From these well-reasoned and controlling decisions of the Supreme Court of the United States, and the latest expressions of that high court on the subject, we find certain definite lines of demarcation between interstate and intrastate commerce, and conclude that interstate commerce under the terms as well as under the limitations of the Constitution of the United States, and of the laws made in pursuance thereof, is not the subject of private contract or private arrangement, but of public law, applied in particular cases with regard to the legal principles of the subject, measuring the extent of interstate commerce, or commerce between the states of the Union and foreign countries, or between the respective states.

Where interstate commerce begins, as a matter of general definition, is more easily arrived at, than to find, in a case of intrastate commerce following an interstate shipment, the particular point of separation or the principles applicable to the separation, in the event such separation exists. Most of the adjudicated cases present this difficulty. In the case of Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715, since approved by the Supreme Court of the United States in a number of its leading cases on the subject, Mr. Justice Bradley, speaking for the court, gives a rather full and illustrative statement as to the initial point of interstate commerce:

"It is true, it was said in the case of The Daniel Ball, 10 Wall. 557, 565, 19 L. Ed. 999, 'whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for trans-portation to such state, its destination is not fixed and certain."

The question as to the end of an interstate shipment, as respects claims of intrastate change, is more difficult. This is the difficulty in the instant case, and the best definition, applicable to almost similar facts and conditions, is found in the case of General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754, Mr. Justice McKenna, speaking for the court, said:

"The company was doing business in the state, and its property was receiving the protection of the state. Its oil was not in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, as in State, etc., v. Engle [34 N. J. Law, 425], but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the state beyond a mere halting in its transportation. It required storage there—the maintenance of the means of storage. * * * The bill takes pains to allege this. 'Complainant shows that it is impossible, in the coal oil business such as complainant carries on, to fill separately each of these small orders directly from the railroad tank cars, because of the great delay and expense in the way of freight charges incident to such a plan, and for the further reason that an extensive plant and apparatus is necessary, in order to properly and conveniently unload and receive the oil from said tank cars, and it would be impracticable, if not impossible, to have such apparatus and machinery at every point to which complainant ships said oil.' This certainly describes a business—describes a purpose for which the oil was taken from transportation, brought to rest in the state, and for which the protection of the state is necessary, a purpose outside of the mere transportation of the oil."

In the instant case, the particular question for decision is not as to the status of the commerce en route from Baton Rouge or Charleston to Wilmington in the tank ships of the complainant, complainant for such journey being consignor, carrier, and consignee; but what is the character of the subsequent shipments over defendants' lines to points within the same state as the port of entry, subsequent and independent shipments, not arranged with the initial shipment? The shipments from Baton Rouge

and Charleston to Wilmington are, obviously, only relevant in that they themselves involve interstate commerce. Now the question is: Does such interstate character continue beyond Wilmington to the ultimate places of retail distribution or consumption within North Carolina, under the admitted facts of the case?

It may now be more enlightening to the correct solution of this case that we examine the adjudicated cases that may on first reading seem to decide this case "this way or that way," and distinguish them from the instant case. In the instant case the shipment is one from without the state of North Carolina to a port of entry therein, at which port of entry the shipment finds an established storage plant, necessary for and adapted to the particular commodity, in like extent and character, as a warehouse or wholesale depot, for other products.

In the case of Texas & N. O. R. Co. v. Sabine Trans. Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442, the shipment was from interior points of the United States, or of the state of Texas, to a port of exit, thence out of the United States into foreign commerce, and those shipments to that port were for the sole and only purpose of transportation in a continuing journey of foreign commerce. This distinction is likewise applicable to the case of Southern Pacific Terminal Co. v. Interstate Commerce Commission and Young, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310, and the case of Ohio Railroad Commission v. Worthington, Receiver, et al., 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004.

In the instant case the original shipment in complainant's tank steamers reached a physical rest at Wilmington, a place of storage for distribution, not in foreign commerce or commerce with other states, but a new commerce within the state of North Carolina, for the avowed and admitted purpose of ultimate reshipment by distinct and separate consignments, over new carriers, not to one point only and to a particular place of business of the complainant, but to many places of local distribution, as well as to the trade generally, within the state, and not, as in the case as disclosed by the pertinent facts in the case of B. & O. S. W. R. R. Co. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189, where the shipment was avowedly to Madisonville, Ohio, the place of business of the shipper, and not Oakley, Ohio, where the shipper had no place of business, but used Oakley for the purpose of receiving the benefit of the new shipment in the difference between the interstate and intrastate rates.

As a summary of the facts of the particular case before us, of the respective contentions of the complainant and the defendants, and the foregoing legal principles, it is submitted:

The position of the defendants is that the business arrangement of the complainant, if not conceived for the purpose, does in effect defeat their right to interstate rates which are higher than their intrastate rates on all shipments of the complainant's products from Wilmington to the interior points within the state; that the initial shipments from Baton Rouge and Charleston to Wilmington constitute interstate commerce; that the storage of the oil and gasoline at Wilmington is in accordance with the necessities of the situation there, and may be reconciled with a construction that the subsequent reshipments are but continuing or interstate shipments; that the storage is only temporary in character, or as a depot of immediate or future reshipment to the complainant's own agencies within the interior of North Carolina; that the shipments or sales to independent agents or consumers are small in volume; and that these facts establish all the essential elements of interstate commerce.

For the complainant it is urged that the plan adopted in the instant case is the inevitable arrangement necessary to the particular business of the complainant; that the storage tanks and other apparatus at Wilmington are similar in all practical respects to a warehouse or wholesale commercial establishment, a place of concentration for future distribution, and that there is no merit in the attempt to differentiate independent and subsequent shipments from the central storage station at Wilmington to the particular local storage stations within the state and shipments to independent consignees or consumers; that the course of large business in the United States is in the same line, and along like plans of operation, as in the instant case, and that to deny the complainant the relief asked is to subject it to the purely commercial demands of the defendants.

As hereinbefore stated, the sole question in this case being a question of rates, whether interstate or intrastate, it is desirable to observe that the cases growing out of federal anti-trust legislation throw comparatively little light on the pending controversy. They deal with trade, and are concerned with the multifarious practices that tend

unduly to restrain competition in interstate commerce. The problem here is exclusively one of transportation, and seems to resolve itself at last into the single inquiry as to whether, in contemplation of law, the movements of complainant's commodities by rail out of Wilmington to interior points within the state of North Carolina are to be regarded as mere continuations of prior movements in interstate commerce into Wilmington, or whether, on the contrary, they take the character of separate movements in intrastate commerce.

Moreover, there is another line of cases which it is desirable to observe, and which deal with the right of the states to tax commodities shipped in interstate commerce but held within the state pending further shipment. The decision of most of these cases depends mainly upon the nature and purpose of the interruption of the movement—whether, on the one hand, it is merely incidental to an uncompleted and constructively continuous movement in interstate commerce, or, on the other hand, the interstate movement has terminated, with the result that the goods have lost their quality as materials of interstate commerce and their consequent immunity from ordinary state taxation, and must henceforth be regarded as a part of the general mass of property of the state. Thus, since the tax cases, so called, are prone to turn upon the identical point involved in the instant case, their discussions should prove decidedly helpful here. The analogy is so close, indeed, that little would be hazarded in saying that, when the stoppage of an interstate shipment is so complete as to subject its materials to ordinary local taxation, as distinguished from impositions incident to a legitimate exercise of the police power of the state, the further shipment of such materials would be regarded as wholly independent of the prior movement, and, if made to points within the state, would be governed by valid intrastate rates. And the converse of this proposition is equally true, namely: If the stoppage is merely incidental to an uncompleted through shipment in interstate commerce, so that the goods would not be subject to ordinary local taxation at the point of stoppage, in such case the further movement would retain the character of an interstate shipment and would take the interstate rate. Such would seem to be the unavoidable conclusion from the reasoning of the decisions in this class of cases. A very recent case in point, in which the prior cases are carefully examined and distinguished by Mr. Chief Justice Taft, is Champlain Realty Co. v. Brattleboro, 260 U. S. 367, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195, supra.

While the local tax jurisdiction is not directly in issue here, it assuredly helps to a right decision of the question of rate jurisdiction, which alone is in litigation, to inquire whether, in any view of the facts disclosed by the record, the complainant could successfully resist the collection of ordinary local taxes on the oil and gasoline held in its tanks at Wilmington for further shipment to points either within or without the state of North Carolina.

The tax jurisdiction of the state and its municipalities and the rate-making power of the state are excluded by precisely the same circumstances, namely: (1) The movement in its incipiency must be interstate; and (2) the movement must be actually or constructively continuous to a destination beyond the disputed terminus where the local tax jurisdiction or the local jurisdiction of freight rates is asserted. These, and none other, are the conditions of immunity from local taxation and intrastate freight rates; and whether the one jurisdiction or the other is in controversy, the terminology and definitions of judicial discussion appear to be precisely identical.

In the application of the tax test, so to speak, no particular significance should be given to the circumstance that the complainant in fact does pay the ordinary local taxes on the commodities in question. Our inquiry is as to whether it is legally obligated to submit to such taxation. Nor does it seem at all material either that the movements into Wilmington are by ships privately owned or operated by the complainant, or that complainant's shipments out of Wilmington over the railroads of the defendants are in tank cars leased by complainant from a private owner. The movements into Wilmington are none the less interstate commerce because the carriage is private; and complainant's shipments out of Wilmington are handled by the defendants as common carriers, irrespective of the ownership of the vehicle employed.

There is no room for dispute as to the existence of the first condition of immunity from the local tax jurisdiction and rate control, if complainant's commodities move into Wilmington in interstate commerce. Nor is it denied that this in-bound movement is halted at Wilmington. The state jurisdiction of taxation and rate control must therefore depend entirely upon the legal quality of

this interruption of the actual continuity of the movement. If the pumping from ship tank to land tank is to be regarded simply as the process by which the shipload is broken up into carloads for the purpose of completing a through movement, whether to a single destination or to any number of separate destinations, in such case the actual stoppage at Wilmington, however protracted, would have no effect to break the legal continuity of the movement, and the commodities, whether held in the tanks at Wilmington or in process of further shipment by rail or water out of Wilmington, still would retain their quality of shipments moving in interstate commerce, and their consequent exemption from the local jurisdiction of taxation and rate control.

Conversely, if the purpose of the shipments into Wilmington was to provide a reserve supply at complainant's base at that port with reference to the anticipated demands of its trade in the tributary territory, whether arising through its subagencies, its fixed contracts, or its casual sales, in whatever places or proportions such demands should arise, in such case the interstate shipment must be deemed to have terminated at Wilmington, and the materials of such shipments would thereupon become incorporated in the general mass of the property of the state, and would thereby become subject to the tax jurisdiction of the state, and subsequent shipments to points within the state would fall within the state jurisdiction of rate control; and this no doubt would be equally true if the stocks so accumulated at Wilmington were used exclusively to supply the fluctuating demands of complainant's own subagencies throughout the state. No great significance, therefore, attaches to the circumstance that approximately 90 per cent. of complainant's Wilmington receipts are disposed of through its own subagencies, and that the remaining 10 per cent. is about equally divided between its local trade at Wilmington and its independent sales elsewhere in the state.

The distinction between interruptions of shipments in interstate commerce which do and which do not break the legal continuity of movement, vital to this controversy, appears to be this: If the stoppage is in good faith (i. e., not merely a subterfuge of rate manipulation), and the goods pass into the actual possession and control of the consignee or owner for the benefit of his own business, to the exclusion of the possession or control of the carrier, such stoppage would be effective to break the legal continuity of the movement, and any further shipments of the goods would be regarded as wholly independent movements. But if the stoppage is essentially a transportational incident, however much it may benefit the consignee or owner by way of enabling him to subdivide and redirect the shipment or otherwise, the goods remaining the while in the actual or constructive custody or control of the carrier, in such circumstances, at least, the stoppage could have no effect to break the continuity of the movement and the goods, to their ultimate destination or destinations, would retain all the characteristics and immunities of shipments in interstate commerce.

If the foregoing propositions are well founded in reason and authority, the conclusion is obvious that the interstate movement of complainant's commodities terminates at Wilmington; that they thereupon become incorporated in the general mass of property of the state, and their subsequent intrastate carriage by common carriers is subject-matter of the state's jurisdiction of rate control; and that the complainant, therefore, is entitled to the relief prayed by its bill.

In conclusion, my thought is that in the instant case the power of the federal government, under the Constitution, is not assailed in any of its rights; that the proper jurisdiction of the Interstate Commerce Commission is not involved or questioned; that no conflict exists between the rival claims of complainant and defendants, suggesting any curtailment of the power of the national government over interstate commerce in the fullest meaning of that term to compel adoption of the position of the defendants.

Upon the other hand, a recollection of our legal history, of the particular solicitude of the founders to preserve the dual form of our government in almost all matters, make us pause with some feeling of impending danger—an alarm sounded by the Supreme Court of the United States itself in the so-called "Child Labor Cases," not long since decided by that high tribunal, at the attempted unwarranted extension of federal power over all manner of domestic problems, to the inevitable end that sooner or later the demarcation between the constitutional limitations on federal power and state power will be obliterated.

For the reasons stated, I think that the relief asked by the complainant, the Standard Oil Company of New Jersey, should be granted, and an order and decree will be entered accordingly.