229 U.S. 336 (1913)
RAILROAD COMMISSION OF LOUISIANA
v.
TEXAS AND PACIFIC RAILWAY COMPANY.
No. 335.
Supreme Court of United States.
Submitted May 8, 1913.
Decided June 10, 1913.
APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.
Mr. Ruffin G. Pleasant, Attorney General of the State of Louisiana, Mr. Wylie M. Barrow, Assistant Attorney General, and Mr. E. Howard McCaleb for appellants.
Mr. Charles Payne Fenner, Mr. Walker B. Spencer, Mr. Philip S. Gidiere, Mr. Esmonds Phelps, Mr. Henry Bernstein, Mr. John Totts and Mr. F.G. Hudson for appellees.
*337 MR. JUSTICE McKENNA delivered the opinion of the court.
Suit in equity to declare void certain orders of the Railroad Commission of the State of Louisiana and to restrain the enforcement of penalties for the alleged violation thereof. The ground of the suit is that the orders and the penalties constitute a regulation of interstate commerce and therefore are in violation of the commerce clause of the Constitution of the United States.
An amended and supplemental bill was filed by leave of the court, making the appellant, Walter Guion, then Attorney General of the State, a party on the ground that he had asserted a right and intention to bring suits in the state courts to collect the fines and penalties imposed by the State Railroad Commission.
A demurrer was filed to the bill, stating as grounds thereof  (1) That neither the original nor the supplemental bill stated any cause for the relief prayed. (2) That the suit was one against the State, being one brought to restrain the State in her sovereign character and capacity from instituting suits to recover and enforce the collection of penalties imposed under and by virtue of the provisions of her constitution of a penal nature. (3) That the amount involved is not sufficient to give the court jurisdiction, not being over $2,000.
The demurrer was overruled. An answer was then filed. The case was referred to a master, who reported his conclusions of fact and of law and recommended that the bill be dismissed, basing his recommendation on Gulf, Colorado & Santa Fe R.R. Co. v. Texas, 204 U.S. 403.
The Circuit Court, however, drew a different conclusion from the facts, and entered a decree perpetually enjoining the fines imposed. The decree was affirmed by the Circuit Court of Appeals, expressing, without discussion, its concurrence with the court below that on *338 the facts found by the master the commerce involved in the case was interstate.
The facts as found by the master may be summarized as follows:
The appellee railroad companies are corporations engaged in interstate and intrastate commerce from points within and without the State of Louisiana to the City of New Orleans, and the freight transported by them is subsequently loaded on board ships and transported to foreign ports and countries. The Railroad Commission of Louisiana, on May 25, 1905, promulgated and put in effect an order which fixed the freight rates that the railroads should be entitled to charge on all intrastate traffic, and the rates were effective and in force at the date of the shipment in controversy. In the months of July, August and September, 1905, certain persons (their names are unimportant) delivered to the St. Louis, Iron Mountain & Southern Railway Company at certain stations on the line of its road, within the State, eighteen carloads of logs and staves. The logs and staves were transported by the railway from said stations and delivered to Alexandria and there delivered to the Texas & Pacific Railway Company, which transported them to New Orleans, where they were unloaded from the cars, put on board ship and exported to foreign countries.
When the shipments were made, the local tariff filed with and approved by the State Railroad Commission was ten cents per hundred pounds; the local tariff filed with and approved by the Interstate Commerce Commission on such shipments, at that time, was twelve cents per hundred pounds.
The consignees were notified of the arrival of the cars at New Orleans and the Texas & Pacific Railway Company was ordered by them to deliver the freight to certain steamships plying between New Orleans and European ports. The freight was delivered in accordance with the *339 orders and exported from Louisiana. A freight rate of twelve cents per hundred pounds was charged on the shipments and collected by the railway company.
In March, 1905, a shipper delivered to the Kansas City Southern Railway Company at Leesville, Louisiana, on its line of road, three carloads of tank staves, which were loaded in cars of the Texas & Pacific Railway Company to be transported to a named consignee at New Orleans. The rate established by the State Railroad Commission was ten cents per hundred pounds; the interstate rate filed with the Interstate Commerce Commission was fifteen cents per hundred pounds. The staves were hauled to Shreveport, Louisiana, and there delivered to the Texas & Pacific Railway Company, which hauled them to New Orleans. The customary notice of their arrival was given to the consignee and they were directed by him to be delivered to a particular steamship, to which they were delivered, being switched to the lines of two other carriers and transported to Hamburg. The Texas & Pacific Railway Company collected freight charges thereon from the consignee at fifteen cents per hundred pounds. The consignee at the date of the shipment of the freight resided at New Orleans and was engaged in the business of shipping broker in negotiating for cargo space, routes, and attending to shipments for consignors in the United States. The consignees of the eighteen carloads of logs and staves were engaged at New Orleans in the business of exporting staves to foreign countries; the staves they deal in are not treated, manufactured or changed from the original shape in which they are received at New Orleans for export, and 98% of the shipments by them at New Orleans are exported to foreign countries.
At the time of the shipment the rules of the State Railroad Commission allowed four days' free time for unloading cars at New Orleans, except where the consignment *340 was for export, then twenty days were allowed. No demurrage was tendered by the shipper or consignee or received by the carrier on account of delays in handling beyond the four days allowed by the rules. Every one of the shipments paid to the carrier three-fourths of a cent per hundred pounds for handling charges, this being the amount paid on all export shipments. The shipments were in the physical custody of the railroad company until arrival at New Orleans and thereafter in the physical custody of the steamships, which issued bills of lading therefor to the shippers of the cargo.
The bills of lading in each instance provided for the delivery of freight from the initial point to New Orleans, there to be delivered to the shipper or consignee's order. But, notwithstanding this, the staves and logs were intended by the shippers to be exported to foreign countries, and were treated by both the shippers and the carriers accordingly, the shippers always holding the cars on the railroad track until they could accumulate cargo to fill their export orders and arrange for transportation. The railroad company allowed the shippers the usual twenty days' time for delivery, as in the case of export shipments, without charging demurrage, which the company would have had the right to charge, after the expiration of four days, if the shipments had been considered and treated as purely intrastate.
The sole question in the case is whether the shipments were foreign or intrastate commerce, or, speaking more accurately, whether they were within Federal or state jurisdiction. The Circuit Court and the Circuit Court of Appeals both decided, as we have seen, that they were within Federal jurisdiction.
Appellants attack the conclusion and rely on, as the master relied on, the case of Gulf, Colorado & Santa Fe R.R. Co. v. Texas, supra. The argument is that the service rendered by the railroad companies was wholly *341 within the State and had "no contractual or necessary relation to foreign transportation." It was, it is argued, "manifestly preliminary thereto, independently contracted for, and not necessarily connected therewith." And the principle is urged that "locality, therefore, determines the jurisdiction [separation between Federal power and state power] unless it is shown that though the local movement is actually within, it is legally outside the State." To make the movement within legally outside of the State, appellants insist there must be bills of lading and other means of connection between the railroads and the ocean carriers. To make application of this principle, it is contended that "not a single fact appears or exists, physical or other which connects the railroads with the ocean carrier" and that the intention of the shippers or consignees is made absolutely controlling.
To the principle urged, so far as its applicability to the case at bar is concerned, we may oppose Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498; Ohio Railroad Commission v. Worthington, 225 U.S. 101; and Texas & New Orleans R.R. Co. v. Sabine Tram Co., 227 U.S. 111.
In those cases there was necessarily a local movement of freight, and it necessarily terminated at the seaboard. But it was decided that its character and continuity as a movement in foreign commerce did not terminate, nor was it affected by being transported on local bills of lading. The principle enunciated in the cases was that it is the essential character of the commerce, not the accident of local or through bills of lading, which determines Federal or state control over it. And it takes character as interstate or foreign commerce when it is actually started in the course of transportation to another State or to a foreign country. The facts of the case at bar bring it within the ruling. The staves and logs were *342 intended by the shippers to be exported to foreign countries, and there was no interruption of their transportation to their destination except what was necessary for transshipment at New Orleans.
Decree affirmed.