## CHAMPLAIN REALTY COMPANY *v.* TOWN OF BRATTLEBORO.

### CERTIORARI TO THE SUPREME COURT OF THE STATE OF VERMONT.

No. 128. Argued November 27, 28, 1922.—Decided December 11, 1922.

Logs, under control of their owner, which are being floated in a river in continuous movement from one State to another, or which, in the course of their interstate journey, are being temporarily detained by a boom to await subsidence of high waters and for the sole purpose of saving them from loss, are in interstate commerce and not subject to state taxation. P. 371. *Coe* v. *Errol,* 116 U. S, 517, and other cases, distinguished.

113 Atl. 806, reversed.

This was a suit in assumpsit by the petitioner, the Champlain Realty Company, to recover $484.50 and interest, from the Town of Brattleboro, Vermont, being the amount of taxes levied on logs of pulp wood of the petitioner floating in the West River in that town on April 1, 1919, and paid by the petitioner under protest as illegally collected because the logs were then in transit in interstate commerce to Hinsdale, New Hampshire. The suit

was brought in the County Court, and the defendant having failed to set the cause for jury trial within the time fixed by statute, it was heard by the court, which made findings of fact that under the state practice are conclusive on review by the Supreme Court. The County Court gave judgment for the Realty Company. The Town took the case on exceptions to the Supreme Court.

The Supreme Court summarized the findings of fact by the County Court as follows:

" During the winter of 1918–19, the plaintiff cut pulp wood, in all about 10,000 cords, in the towns of Jamaica, Stratton, Londonderry, and Winhall in this State. The plaintiff maintains a mill at Hinsdale, in the State of New Hampshire, about three miles below Brattleboro, where its pulp wood is rossed and bolted. The wood, cut four feet long, was placed upon the banks of West River and its tributaries to be floated down into the Connecticut and thence to its destination at the mill in Hinsdale. The waters of the West River are wholly in this State and empty in the town of Brattleboro into the Connecticut. West River and its tributaries had been used for driving pulp wood to the mill at Hinsdale in the years 1917 and 1918. A single log boom is provided at the mill to receive the wood floated down the river, but is incapable of holding it all when the water in the Connecticut is high and the current swift, and the wood is liable to be carried over and drawn under the boom and lost. A pond of considerable size is formed near the mouth of West River in the town of Brattleboro by water set back from the Connecticut by the dam at Vernon. Plaintiff maintains a boom at this point to hold and control the logs driven down West River until the water in the Connecticut has receded sufficiently to permit of their being held in the boom at Hinsdale.

" On March 25, 1919, the plaintiff began putting the pulp wood into the West River and its tributaries, the

water in these streams then being high, intending to drive it down the river and thence into the Connecticut and down that river to its mill in Hinsdale. In anticipation of the probable high water in the Connecticut, plaintiff had previously placed its boom across West River near its mouth to hold the wood there until the water in the Connecticut had receded enough to allow it to be held at the mill at Hinsdale. The wood floated down West River on the high water, and at the head of the drive reached the boom at the mouth of West River on March 27, 1919. At that time the Connecticut was so high and its current so swift that it was not thought safe to let the wood into that river, as it could not be held at the Hinsdale boom. For this reason and no other the plaintiff held its wood in the boom at Brattleboro. The Connecticut was not suitable for driving pulp wood from the time the drive began until April 3d, on which date the plaintiff's servants cut the boom at the mouth of West River so that the wood could pass into the Connecticut. Prior to April 3d, only about 4,000 cords of the wood had reached and been held at the West River boom. The balance arriving later went through to Hinsdale without stopping. On March 28, 1919, when there was by estimation about 4,000 cords of wood in the West River boom, it broke, allowing some of the wood to escape into the Connecticut and onto the Retreat meadow in Brattleboro near the mouth of West River. The boom was repaired on March 29, 1919. At this time the part of West River where the wood lay back of the boom, called the holding ground, was frozen, so the wood, if not boomed, could not have continued on its journey into the Connecticut at that time. On April 1, 1919, about 1,500 cords of the pulp wood was being held in plaintiff's boom at the mouth of West River. Some wood that was lodged on an island and the wood on the Retreat meadow remained after the boom was cut. The latter remained on the meadow about two weeks and had

to be taken out by a process called ' booming ' or ' warp-
ing.'   None of this 1,500 cords was cut in the town of
Brattleboro. ˙All of it had been carried down West River
and was destined for the plaintiff's mill at Hinsdale, N. H.,
by way of ·the Connecticut.   The drive of pulp wood down
West River to the Connecticut and thence to the rossing
plant at Hinsdale was in continuous operation from March
25th until it was completed on May 9th, and was con-·
ducted properly to˙make an uninterrupted passage, so far
as possible."

On these findings the Supreme Court held that the
interstate transit did not begin until the wood left the
Brattleboro boom.   Everything before that was merely
preparations.   The floating of the logs · from the West
River towns to Hinsdale was interrupted, and the inter-
ruption, although only long enough to secure safety in
the drive, was for the, benefit of the owner and in law
postponed the initial step in the interstate transit until
the wood was released from the Brattleboro boom.   The
court, therefore, held the wood taxable àt Brattleboro
and reversed the County Court.

*Mr. William C. Cannon* and *Mr. Melville P. Maurice,*
with whom *Mr. Theodore W.·Morris Jr.,* was on the
briefs, for petitioner.

*Mr. Arthur P. Carpenter* and *Mr. Ernest W. Gibson*
for respondent.

The facts clearly establish that the immediate ·destina- ·
tion of the wood, when it was started from the forest, was
the pond behind the boom at the mouth·of West.River in
Brattleboro.   The wood˙was cut in the various towns in
the West River Valley, and floated down the tributaries
of West River, and that river itself,. until it was gathered
together in that safe haven, the pond, caused by the set-
back of˙the ˙water of the˙Connecticut, behind the plain-
tiff's boom, called the " holding ground."   The petitioner's

45646°—23——24

intention to float the wood, at some indefinite time, to its rossing mill at Hinsdale, is wholly immaterial. *Coe* v. *Errol*, 116 U. S. 517; *Diamond Match Co.* v. *Ontonagon*, 188 U. S. 82; *Bacon* v. *Illinois*, 227 U. S. 504; *General Oil Co.* v. *Crain*, 209 U. S. 211; *Susquehanna Coal Co.* v. *South Amboy*, 228 U. S. 665; *Burlington Lumber Co.* v. *Willetts*, 118 Ill. 559; *Prairie Oil & Gas Co.* v. *Ehrhardt*, 244 Ill. 634.

When general statements in findings of fact made by the lower court are opposed to specific findings, as to what actually took place, made at the same time, the specific findings will control. *McCormick* v. *National Surety Co.*, 134 Cal. 510; *Gebhard* v. *Merchant*, 84 Ark. 359.

The interpretation given to findings of fact of a lower court by the State Supreme Court is binding here.

The findings of fact referred to when read as a whole and in the light of the specific findings, as to what actually took place, clearly support the interpretation given to them by the Vermont Supreme Court, namely, that at the time of the assessment of the tax, April 1, 1919, the pulp wood " was then at rest in the boom at Brattleboro for a time necessarily indefinite and for a purpose beneficial to the plaintiff." The plaintiff made preparations long in advance of starting the wood down West River and its tributaries to stop the wood in the " holding ground " at Brattleboro. It built and maintained a boom there, and as early as the middle of March, ten days before any of the wood started down the river, it " placed its boom across West River near its mouth and in the town of Brattleboro for the purpose of holding the wood in the West River until the water in the Connecticut had receded enough to allow the wood to be held on said river at plaintiff's said mill at Hinsdale." For whose " convenience and benefit " was this boom at the mouth of West River built and maintained if not for the convenience and benefit of the plaintiff?

The plaintiff apparently loses sight of the distinction between the cases where property is delivered to a common carrier for transportation out of the State and the cases where property, as in this case, is being transported by the owner and is at all times under its control.

The plaintiff had the privilege of continuing the transportation, but of this it might avail itself or not as it chose. It might sell the wood in Vermont or forward it, as it saw fit. It was in its possession with the control of absolute ownership: It may have intended, at an indefinite time, to forward the wood to its rossing mill in Hinsdale, N. H., but this intention, while the wood remained in the boom at Brattleboro and before it had been started from the boom on its final journey, did not make it immune from local taxation.

In an action to recover money paid as a tax the burden is upon the plaintiff to show that the tax was illegally assessed; or, to be specific, to establish the interstate character of the transportation.

MR. CHIEF JUSTICE TAFT after stating the case, delivered the opinion of the Court.

The Vermont Supreme Court depended for its conclusions chiefly upon *Coe* v. *Errol*, 116 U. S. 517, which is the leading case on this subject. There logs had been cut on Wentworth's Location in New Hampshire during the winter, and had been drawn down to Errol in the same State, and placed in Clear Stream and on the banks thereof on lands of John Akers and part on land of George C. Demerritt in said town, to be from thence floated down the Androscoggin River to the State of Maine (p. 518).

It is not clear how long they had lain there, but certainly for part of one winter season. This Court, speaking by Mr. Justice Bradley, sought to fix the time when

such logs, in the course of their being taken from New Hampshire to Maine, ceased to be part of the mass of property of New Hampshire and passed into the immunity from state taxation as things actually in interstate commerce. The learned Justice states the rule to be " that such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." (P. 527.)

Again, on page 528, Justice Bradley said: " The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another State, or committed to a common carrier for transportation to such State, its destination is not fixed and certain. It may be sold or otherwise disposed of within the State, and never put in course of transportation out of the State. Carrying it from the farm, or the forest, to the depot, is only an interior movement of the property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the State its exportation is a matter altogether *in fieri*, and not at all a fixed and certain thing.

" The application of these principles to the present case is obvious. The logs which were taxed, and the tax on which was not abated by the Supreme Court of New Hampshire, had not, when so taxed, been shipped or started on their final voyage or journey to the State of

Maine. They had only been drawn down from Wentworth's Location to Errol, the place from which they were to be transported to Lewiston in the State of Maine. There they were to remain until it should be convenient to send them to their destination." (P. 528.)

The question here then is, Where did the interstate shipment begin? When the wood was placed in the waters of the West River in the towns of Jamaica, Stratton, Londonderry and Winhall, or at the boom in Brattleboro? The whole drive was ten thousand cords. Six thousand cords of that, shipped from these towns after the third of April, went through directly to Hinsdale, New Hampshire, without stopping. Certainly that was a continuous passage and the wood when floating in the West River was as much in interstate commerce as when on the Connecticut. Why was it any more in interstate commerce than that which had been shipped before April 3rd from the same towns for the same destination by the same natural carrying agency, to wit, the flowing water of the West and Connecticut Rivers? Did the fact that before April 3rd the waters of the Connecticut were frozen, or so high as to prevent the logs reaching Hinsdale, requiring a temporary halting at the mouth of the West River, break the real continuity of the interstate journey? We think not. The preparation for the interstate journey had all been completed at the towns on the West River where the wood had been put in the stream. The boom at the mouth of the West River did not constitute an entrepot or depot for the gathering of logs preparatory for the final journey. It was only a safety appliance in the course of the journey. It was a harbor of refuge from danger to a shipment on its way. It was not used by the owner for any beneficial purpose of his own except to facilitate the safe delivery of the wood at Hinsdale on their final journey already begun. The logs were not detained to be classified, measured, counted

or in any way dealt with by the owner for his benefit, except to save them from destruction in the course of their journey that but for natural causes, over which he could exercise no control, would have been actually continuous. This was not the case in *Coe* v. *Errol*. It is evident from the statement of that case, and Mr. Justice Bradley's language, that the logs were partly drawn and partly floated to Errol and deposited some in the stream and some on the banks, where " they were to remain until it should be convenient to send them to their destination," and they were being gathered there for the whole previous winter season. It was an entrepot or depot as the Justice several times describes it. The mere fact that the owner intended to send them out of the State under such circumstances did not put them into transit in interstate commerce. But here, we have the intention put into accomplishment by launching, and manifested by an actually continuous journey of more than half the drive, with a halting of less than half of it in the course of the interstate journey to save it from loss, and only for that purpose.

The case at bar is easily distinguishable from the other cases cited by the Vermont Supreme Court. In *Bacon* v. *Illinois,* 227 U. S. 504, Bacon had bought shipments of grain *in transitu* from Western States to New York in the contract for which the carriers had given the shipper the right to remove it " for the mere temporary purposes of inspecting, weighing, cleaning, clipping, drying, sacking, grading or mixing, or changing the ownership, consignee or destination." On arrival of the grain in Chicago, Bacon removed the grain from the cars to his private elevator. This removal was for the purpose of inspecting, weighing, grading, mixing, etc., but not to change its ownership, consignee or destination. It was held that whatever his intention, the grain was at rest within his complete power of disposition and held for his

own benefit and was taxable. His storing of the grain was not to facilitate interstate shipment of the grain, or save it from the danger of the journey. It was to enable him to treat the grain so as to enable him more conveniently to dispose of it. He made his warehouse a depot for its preparation for further shipment and sale. He had thus suspended the interstate commerce journey and brought the grain within the taxable jurisdiction of the State.

So, in *General Oil Co.* v. *Crain,* 209 U. S. 211, the Oil Company had its principal place of business in Memphis, Tennessee, for the manufacture and sale of illuminating oils in interstate commerce. It imported oil from other States and put it into a tank, appropriately marked for distribution in smaller vessels to fill orders for oil already sold in Arkansas, Louisiana and Mississippi. The Court held that the first shipment had ended, that its storage at Memphis for division and distribution to various points was for the business purposes and profit of the company. The Court continued: " It was only there for distribution, it is said, to fulfill orders already received. But to do this required that the property be given a locality in the State beyond a mere halting in its transportation." (P. 231.) The tank at Memphis thus became a depot in its oil business for preparing the oil for another interstate journey. So far as it bears upon this case, *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, presented a similar state of facts and ruling.

In *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82, the company cut one hundred and eighty million feet of timber for the purpose of saving the same from fire and to protect and preserve it put it into the Ontonagon River, Michigan. It was drawn down to the mouth of the river into the township of Ontonagon, Michigan, to the sorting ground and pier jams of the company, and there it was taxed. The logs remained there and were

shipped as they were needed to Green Bay, Wisconsin, to the mills of the company. Not more than forty million feet a season were needed. Palpably the company's sorting grounds and pier jams were a depot for the keeping of the logs for the business purposes of the company and there was no interstate commerce until the final shipment to Green Bay began.

In the cases of *Brown* v. *Houston,* 114 U. S. 622, and *Pittsburg & Southern Coal Co.* v. *Bates,* 156 U. S. 577, the coal in barges in the Mississippi River which was the subject of taxation had come to rest in Louisiana, after a trip from Pittsburg, and was being held for sale to anyone who might wish to buy.

The interstate commerce clause of the Constitution does not give immunity to movable property from local taxation which is not discriminative, unless it is in actual continuous transit in interstate commerce. When it is shipped by a common carrier from one State to another, in the course of such an uninterrupted journey it is clearly immune. The doubt arises when there are interruptions in the journey and when the property in its transportation is under the complete control of the owner during the passage. If the interruptions are only to promote the safe or convenient transit, then the continuity of the interstate trip is not broken. *State* v. *Engle,* 34 N. J. L. 425; *State* v. *Carrigan,* 39 N. J. L. 35. This was the case in *Kelley* v. *Rhoads,* 188 U. S. 1, in which sheep, driven 500 miles from Utah to Nebraska, which travelled nine miles a day, were held immune from taxation in Wyoming where they stopped and grazed on their way. Another instance is as to that part of the logs in *Coe* v. *Errol,* which were not before this Court because the Supreme Court of New Hampshire had found them nontaxable in New Hampshire. They were cut in Maine and were floated down the Androscoggin on their way to Lewiston, Maine, but were delayed for a season at Errol,

New Hampshire, because of low water. In the cases just cited the transit had begun in one State and was continued through another on the way to a third. This circumstance strengthened the inference that the interruption in the intermediate State did not destroy interstate continuity of the trip. But this is not always so, as *Bacon* v. *Illinois* and *General Oil Co.* v. *Crain* show. In other words, in such cases interstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption during which the tax is sought to be levied.

Of all the cases in this Court where such movable property has been held taxable, none is nearer in its facts than *Coe* v. *Errol* to the case at bar. We have pointed out the distinction between the two which requires a different conclusion here.

*Reversed and remanded for further proceedings not inconsistent with this opinion.*