Argued January 25; affirmed February 8, 1938

# MULTNOMAH COUNTY *v.* DANT & RUSSELL, INC.

(75 P. (2d) 986)

Department 1.

*Frank S. Sever*, Deputy District Attorney, of Portland, and *James R. Bain*, District Attorney, of Portland, for appellant.

*Allen H. McCurtain*, of Portland, for respondent.

BEAN, C. J. The defendant alleged in its further and separate answer, in substance, that it is an Oregon corporation engaged in selling lumber for export and shipment to foreign markets and has sold and exported from the Pacific Northwest several years an average of over 250 million board feet annually; that it was defendant's fixed and regular custom to close a binding contract for the sale to its foreign purchasers before purchasing the quantities and grades of lumber necessary to fill its orders; that prior to October 26, 1936, defendant entered into a written contract with the purchasing commission of the Ministry of Railways of the Chinese Government for the sale of several million feet of railroad ties for ultimate delivery at Nanking, China, and to ship the same to Shanghai, China, during November and December, 1936, barring strikes;

that subsequently defendant began the purchase and assembly of the ties necessary to fill the order and purchased the same from various tie mills in this state in counties near Multnomah county, in each case the mill being directed to deliver the ties to Peninsula dock, in the city of Portland; that on October 26, 1936, the defendant entered into a contract with the States Steamship Company for the shipment of railroad ties from Portland to Shanghai by the steamer "Michigan," or a substitute vessel, in the event that said Michigan was not available, by which said contract of affreightment it was provided that the defendant would deliver said ties f. a. s. said vessel at Peninsula dock, Portland, for loading December 21, 1936, and that prior to December 21, 1936, the defendant had purchased for fulfillment of said export order 34,500 pieces, containing 1,242,000 board feet, and had assembled the same on the Peninsula dock within reach of ship's tackle, and that said ties were purchased for the sole and only purpose of such export shipment in fulfillment of the export order before referred to, and that the ties mentioned were delivered to the Peninsula dock from the place of their manufacture in various ways, but largely by common carrier within the state of Oregon, and that the defendant had contracted for the use of the dock as a place to assemble said ties as a part of their continuous journey to their foreign destination; that on or about the 31st day of October, 1936, a strike of longshoremen and seamen occurred along the Pacific coast, which continued until the fourth day of February, 1937; that because of said strike it was impossible for the steamship company to place a vessel alongside the dock for loading, or to secure a substitute boat for such purpose, until approximately March 18, 1937, when the steamship "Texas" was berthed alongside and com-

pleted her loading on that date, and thereafter the ties were actually delivered to the ship and shipped to the foreign consignee at Shanghai; that the railroad ties sought to be taxed were especially manufactured for use by the Ministry of Railways of the Chinese Government and were of a size, kind and quality demanded by the Chinese and other foreign purchasers, and were neither of a size, grade or quality demanded by or acceptable to domestic purchasers, or of a size or quality generally used in railroad construction in the United States.

It is further alleged in the further and separate answer that on the first day of March, 1937, the assessment date, the ties were in foreign export trade, and that a tax thereon by the state of Oregon was prohibited by sections 8 and 10 of Article I of the Constitution of the United States.

To this further and separate answer, plaintiff demurred on the ground that the answer does not state facts sufficient to constitute a defense to plaintiff's complaint.

The only issue in the case is the question whether, under the facts as alleged by defendant's further and separate answer and defense, the railroad ties sought to be taxed were, in fact, in foreign commerce; that is to say, whether they had in fact commenced their journey in foreign commerce or had been severed from the mass of the property of the state so as to distinguish them from other railroad ties within the boundaries of the state.

■ The determination of the case must depend upon the various circumstances thereof. The character of the shipment in such case depends upon all the evidential circumstances looking to what the owner has done in the preparation for the journey and in carrying it

out: *Hughes Bros. Timber Co. v. Minnesota*, 272 U. S. 469, 475 (71 L. Ed. 359, 47 S. Ct. 170). Every tub must stand on its own bottom, and every case must depend upon its own particular facts.

The contention of the plaintiff is that the facts alleged in the complaint show that on the assessment date the ties sought to be taxed were in possession of the defendant, under its sole control and dominion, subject to sale, either within or without the state, and therefore a part of the mass of property of the state, subject to its taxing power.

■ The inhibition of the Constitution of the United States against tax upon exports relates particularly to sales by a citizen of this country to a citizen of some foreign country.

It is agreed that the state has no power or authority to tax personal property when the same is in foreign commerce: §§ 8 and 10, Art. I, Const. of U. S.

The principle that the state cannot tax articles when in foreign commerce has always been recognized since the states in the Constitutional Convention, for the purpose of promoting the uninterrupted movement of products from the markets of the several states to other states and to foreign countries, waived the right to tax the same, so as to insure such free and uninterrupted movement.

The contract between the exporter and his foreign customer, and the method of fulfilling it, and that a tax on the merchandise in question, under the circumstances in this case, would undoubtedly be a burden upon export commerce, should be taken into consideration in determining the question whether the merchandise had begun a continuous journey in fulfillment of such contract; so also the contract between the shipper and the steamship company to load the property for

shipment on or about the 21st day of December, 1936, barring strikes.

■ It makes no material difference whether the merchandise, the subject of the taxation in controversy, had been shipped from an interior point on a bill of lading or whether their initial point is a seaport: *Southern Pac. Terminal Co. v. Interstate Commerce Comm.*, 219 U. S. 498 (55 L. Ed. 310, 31 S. Ct. 279); *Railroad Comm. of Ohio v. Worthington*, 225 U. S. 101 (56 L. Ed. 1004, 31 S. Ct. 279); *Texas & N. O. R. R. Co., v. Sabine Tram Co.*, 227 U. S. 111 (57 L. Ed. 442, 33 S. Ct. 229); *Railroad Comm. of Louisiana v. Tex. & Pac. Ry.*, 229 U. S. 336 (57 L. Ed. 1215, 33 S. Ct. 837); *Champlain Realty Co. v. Brattleboro*, 260 U. S. 366 (67 L. Ed. 309, 43 S. Ct. 146, 25 A. L. R. 1195).

The principles of law involved in this case are well established. The main difficulty is in the application of the law to the facts as alleged by the defendant. The defendant had made a bona fide written contract with the Ministry of Railways of the Chinese Government for the delivery of these ties to Shanghai, China. After making this contract the defendant had made an actual, bona fide written contract with the steamship company to transport the same from the Portland seaport to Shanghai. The contract called for delivery of the ties f. a. s. vessel at Peninsula dock on the Willamette river. It was neither feasible nor practical to require the boat to lie alongside while the ties were unloaded from railroad cars, a car at a time, and placed within reach of ship's tackle. The ordinary custom of trade compelled the defendant to arrange for an assemblage of the ties in large quantities, so as to facilitate their loading into the hold of the vessel and onto her decks.

The ties were purchased from various parties and manufactured for foreign commerce. They were trans-

ported mostly by common carrier from different points —Hood River, some 66 miles from Portland, Newberg, some 25 miles from Portland, and about 48 other places.

The fact that no bill of lading was issued for the initial transportation is not material. The ties were deposited at the Peninsula dock within reach of the ship's tackle. There was no probability that Dant & Russell would divert the lumber from the foreign shipment. It could not do so without violating its contract with the Ministry of Railways of the Chinese Government, and also its contract with the steamship company to transport the lumber from the Portland seaport to Shanghai.

■ We think that the lumber was actually started in course of transportation to a foreign port when it was shipped from the different depots where it was manufactured. After the initial trip the lumber had been delivered to the common carrier as nearly as it was possible to do so under the circumstances. A valid contract was executed with the steamship company and it would have as much force, it would seem, as a bill of lading, except that it would not be based upon a receipt of the ship's mate.

■ The citizens of the state of Oregon, and other states in the Union, are presumed by law to intend to carry out their oral and written contracts. It should not be presumed to the contrary.

In the case of *Southern Pac. Terminal Co. v. Interstate Commerce Comm.*, supra, the right of the Southern Pacific Terminal Company to charge a different rate in intrastate, as distinguished from interstate or foreign commerce, was involved, where a dock owner purchased cotton and by-products throughout the state of Texas, and assembled it at a terminal yard at Galveston, where he re-processed it for subsequent foreign

shipment. Mr. Justice McKenna, at page 525, records the following language:

"The cake and meal purchased by Young are bought by him in Texas, Oklahoma, Louisiana and Arkansas, but chiefly in Texas, and shipped to him on bills of lading and waybills showing the point of origin in those states and the destination at Galveston. The purchases are made for export * * *. His sales to foreign countries are sometimes for immediate and sometimes for future delivery, irrespective of whether he has the product on hand at Galveston * * *. At times, therefore, orders must be filled from cake to be purchased in the interior or then in transit to him. When the cake reaches Galveston it is ground into meal and sacked by Young, and for the meal thus ground and such meal as has been brought to his customers, he takes out ships' bills of lading made to his order.

"* * * It makes no difference, therefore, that the shipments of the products were not made on through bills of lading or whether their initial point was Galveston or some other place in Texas. They were all destined for export and by their delivery to the Galveston, Harrisburg and San Antonio Railway they must be considered as having been delivered to a carrier for transportation to their foreign destination, the Terminal Company being a part of the railway for such purpose. The case, therefore, comes under Coe v. Errol, where it is said that goods are in interstate, and necessarily as well in foreign, commerce when they have 'actually started in the course of transportation to another state, or delivered to a carrier for transportation'."

In *Railroad Comm. of Ohio v. Worthington, supra,* there was involved coal brought from the interior to a lake port for shipment, and Mr. Justice Day, speaking for the court, at page 108, said:

"By every fair test, the transportation of this coal from the mine to the upper lake ports is an interstate carriage, intended by the parties to be such, and the

rate fixed by the commission which is in controversy here is applicable alone to coal which is thus, from the beginning to the end of its transportation, in interstate carriage, and such rate is intended to and does cover an integral part of that carriage, the transportation from the mine to the Lake Erie port.''

The transportation of these ties from the different points by common carrier in the state of Oregon, as mentioned, to the Peninsula dock, we think, corresponds to the transportation of the coal from the mines to the upper lake ports mentioned in the latter case, and in each case such transportation is an interstate carriage.

In *Texas & N. O. R. R. Co. v. Sabine Tram Co.,* supra, the court said:

''The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine. It was to supply the demand of foreign countries that the lumber was purchased, manufactured and shipped, and to give it a various character by the steps in its transportation would be extremely artificial. Once admit the principle and means will be afforded of evading the national control of foreign commerce from points in the interior of a state. There must be transshipment at the seaboard, and if that may be made the point of ultimate destination by the device of separate bills of lading the commerce will be given local character, though it be essentially foreign.

       *      *      *      *      *

''* * * The lumber was ordered, manufactured and shipped for export. And we say shipped, for we regard it of no consequence that the Sabine Company had no concern or connection with it after it reaches Sabine. Its relation to the shipment was a perfectly natural one and did not change the relation of the Powell Company to it and make the lumber other than

lumber purchased at Ruliff and started from there in transportation to a foreign destination. * * * And the shipment was not an isolated one but typical of many others, which constituted a commerce amounting in the year 1905 to 14,667,670 feet of lumber and in the year 1906, 39,554,000 feet. Nor was there a break in the sense of the interstate commerce law and the cited cases, in the continuity of the transportation of the lumber to foreign countries by the delay and its trans-shipment at Sabine. * * *''

In the case of *Railroad Comm. of Louisiana v. Tex. & Pac. Ry.*, supra, there was involved a shipment of tank staves from Leesville, La., to New Orleans, and Mr. Justice McKenna says, as shown, at page 340 of the opinion, as follows:

''The sole question in the case is whether the shipments were foreign or intrastate commerce, or, speaking more accurately, whether they were within Federal or State jurisdiction. * * *

''The staves and logs were intended by the shippers to be exported to foreign countries, and there was no interruption of their transportation to their destination except what was necessary for transshipment at New Orleans.''

It will be observed in the case at bar that the only interruption in shipment from approximately fifty odd interior points to Shanghai was the necessity of unloading the ties on the dock within reach of ship's tackle and the delay caused by a strike over which the defendant had no control whatsoever.

The district attorney cites and relies on the case of *Coe v. Errol*, 116 U. S 517 (29 L. Ed. 715, 6 S. Ct. 475). In the case of *Champlain Co. v. Brattleboro,* supra, Mr. Justice Taft stated as follows:

''The preparation for the interstate journey had all been completed at the towns on the West River where the wood had been put in the stream. The boom at

the mouth of the West River did not constitute an entrepot or depot for the gathering of logs preparatory for the final journey. It was only a safety appliance in the course of the journey   *   *   *. It was not used by the owner for any beneficial purpose of his own except to facilitate the safe delivery of the wood at Hindsdale on their final journey already begun.''

And, referring to the case of *Coe v. Errol*, supra, he said:

''The mere fact that the owner intended to send them out of the state under such circumstances did not put them into transit in interstate commerce. But here, we have the intention put into accomplishment by launching, and manifested by an actual continuous journey of more than half the drive, with a halting of less than half of it in the course of the interstate journey to save it from loss and only for that purpose.''

In *Coe v. Errol*, supra, there were involved two claims in regard to logs. Coe had assembled a large number of spruce logs in a stream in New Hampshire, to be floated down the Androscoggin river to the state of Maine to be manufactured and sold. The logs had been hauled from the timber where they grew and deposited on the bank of the stream or upon the ice. The rafting of the logs was prevented by low water and the town of Errol assessed them for taxation. There was also a quantity of logs belonging to Coe and another person which had been cut in the state of Maine and were on their way, being floated down, to Lewiston, Maine, to be manufactured, but were detained in the town of Errol by low water. The logs cut in Maine had been floated to Errol. It was agreed that for many years the petitioner and his associates in the lumber business had cut large quantities of timber on their lands in Maine and floated them down the Androscoggin river to the mills at Lewiston, Maine, and the

timber thus cut had always laid over one season, being about a year, in the Androscoggin river, either in Errol, Dummer or Milan, and the timber referred to as having been cut in Maine had laid over in Errol since the spring or summer before the taxation, according to custom. The court upheld the tax on the logs cut and transported from Maine to another place in Maine, although they were held over from one year to another at Errol on account of low water for the reason, as we understand, that the transportation commenced when the logs were transported from the place where they were cut in Maine to Errol, much the same as the lumber in question in the present case was transported from the different mills to the Peninsula dock. It was stated in the opinion in the Coe case:

"But no definite rule has been adopted with regard to the point of time at which the taxing power of the state ceases as to goods exported to a foreign country or to another state. * * * that such goods do not cease to be part of the general mass of property in the state, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another state, or have been started upon such transportation in a continuous route or journey."

In the Coe case is found a quotation from the case of *The Daniel Ball*, 10 Wall. 577, as follows:

"Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced."

The lumber in question, we think, had been shipped from the various initial points and had been started upon its transportation in a continuous route or journey to a foreign country.

■ Whenever an article has taken on the character of an export it cannot be taxed by the state or federal

government in any form, not even as a part of the mass of the general property of the state: Gray on Limitation of Taxing Powers, 464-474; *Blount v. Munroe*, 60 Ga. 61; 1 Cooley on Taxation (4th Ed.) 816, § 381; *Spalding Bros. v. Edwards*, 262 U. S. 66 (67 L. Ed. 865, 43 S. Ct. 485); *Hughes Bros. Timber Co. v. Minnesota*, supra; *United States v. Gosho Co.*, 23 Fed. (2d) 675.

The opinion in the case of *Spaulding v. McNary*, 64 Or. 491 (130 P. 391), illustrates what is interstate commerce, and deals with property coming into this state. In that case a carriage maker in Iowa sold the same throughout Oregon by means of agents who traveled through the country, taking orders for carriages which were sent to plaintiff's place of business in Iowa, where another agent would ascertain the financial responsibility of the proposed buyer, and, if found to be good, plaintiff would ship the vehicle to Oregon, when it would be delivered by another agent, thereby transferring title to the buyer. It was held under such a system that the carriages were in fact sold in Iowa and the sales constituted interstate commerce. See also *Mergenthaler Linotype Co. v. Spokesman Pub. Co.*, 127 Or. 196 (270 P. 519).

As to the transportation of the ties in question from the initial points mentioned, mostly by common carriers, perhaps it should be noticed that the mode of transportation of various kinds of freight has undergone a change during the last several years by reason of the construction of good roads and motor truck traffic. The fact that usually there is not so formal a contract made for shipping lumber, grain or livestock by motor truck as there is by railroad or steamboat, where a bill of lading is taken, is not deemed material. No doubt a receipt is given in most instances by the carrier by truck which answers all purposes. The freight

itself is in transportation, and in the case at bar it started from the depots near the mills for Shanghai, with intent that it be delivered there to the Ministry of Railways of China. But for the strike, which delayed such shipment, and which was unseen at the time the contract for the shipment of the ties was made, they would have been delivered, in all probability, in Shanghai before March 1, the taxing date. The ties sought to be taxed already had begun their foreign movement and were placed on the dock in Portland for transshipment purposes only. The dock had been rented for the sole purpose of permitting unloading from the railroad cars or common carriers to place the cargo within reach of ship's tackle in fulfillment of the shipping contract.

The lumber in question was immune from taxation by the state of Oregon. There was no error in overruling the demurrer to the answer; therefore the judgment of the circuit court is affirmed.

ROSSMAN, KELLY and BELT, JJ., concur.