Argued May 1, reversed August 29, 1950

# STEBCO INCORPORATED *v.* GILLMOUTHE

221 P. (2d) 914

*Teunis J. Wyers,* of Hood River, argued the cause and filed a brief for appellant.

*Samuel H. Martin,* of Portland, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, BELT,[*] ROSSMAN and LATOURETTE, Justices.

ROSSMAN, J.

This is an appeal by the defendant, who is the sheriff and tax collector of Hood River County, from a decree of the Circuit Court, which held void a personal property tax in the sum of $6,449.91. The tax was levied on 64 rafts of logs, comprising 8,678,047 board feet, which were moored in Hood River County on

---

[*] Died August 6, 1950.

tax day, January 1, 1947. It is the contention of the plaintiff, owner of the logs, that although the logs were in this state in Hood River County on tax day, they were moving in interstate commerce and were, therefore, immune from taxation in Oregon.

The appellant submits the following assignments of error:

1. "The Court erred in finding a decree in favor of plaintiff-respondent."

2. "The Court erred in not dismissing plaintiff-respondent's complaint and allowing costs to the defendant-appellant."

On tax day, January 1, 1947, 39 of the rafts, which constitute the subject matter of the challenged tax, were moored at a place called Herman's Creek, and the other 25 were moored in Kellog's Cove. Those places are in Hood River County, Oregon. The plaintiff's brief, referring to the 64 rafts, says: "They were at rest at the time the tax was assessed." Some of the logs which comprised the rafts were cut near Lyle, Washington, and the others were cut near Underwood, Washington. Underwood is about 65 miles upstream from Vancouver, Washington, and Lyle is a few miles farther. All of the 64 rafts were destined, according to the plaintiff, from their places of origin (Lyle and Underwood) to Smith's moorage, which is on the Washington side of the Columbia, two miles upstream from Vancouver. All of the rafts had been entrusted by the plaintiff to a towboat operator, Esson H. Smith. It was Smith's duty to accept the rafts promptly when they had been fabricated at Lyle and Underwood and bring them to his (Smith's) moorage in time to serve the plaintiff's needs. Smith had taken all of the 64 rafts into his possession long before tax day, but had been unable to deliver them at his moorage January 1,

1947, for two reasons: (1) The plaintiff at that time neither had need for them nor a place to store them, and (2) all of the available space at Smith's moorage was occupied by other rafts of logs. The plaintiff's brief expresses the situation in these words:

"It was necessary to tie up said sixty-four rafts, enroute, because the log moorage of the carrier at the terminus of the voyage was not large enough to accommodate them."

Because of the circumstances just detailed, Smith moved the rafts across the Columbia and somewhat downstream from Lyle and Underwood to Herman's Creek and Kellog's Cove, where he stored them. None of the rafts remained at the two places in Hood River County less than two months, and some appear to have been there for as long as eleven months.

The problem presented by this appeal is: Was the detention of the rafts in Hood River County incidental to their transportation and caused by a circumstance which impeded their movement (such as ice, storms, unfavorable depth of water or lack of transportational facilities), or was the stoppage invoked in order to serve the interests, convenience or pleasure of the plaintiff?

The plaintiff is the owner of a sawmill, which is located on the Washington side of the Columbia, about three and one-half miles downstream from Vancouver. In 1946 the plaintiff purchased at Lyle and Underwood a large quantity of logs—approximately 25,000,000 board feet—including all of those which we have mentioned. The loggers dumped the logs into the river at Lyle and Underwood and there the plaintiff took possession of them. The total quantity purchased, when rafted, made up about 200 rafts and, as supplemented by smaller quantities procured from Willamette

River loggers, constituted a year's supply for the plaintiff's mill. The logs were not purchased for resale, but for manufacture into lumber in the plaintiff's mill.

The logs which were purchased at Lyle and Underwood were delivered to the plaintiff after the logging season in those areas opened, about March 1. The delivery of logs ceased after the season closed in the early part of November. The quantity upon which the defendant imposed the contested tax was delivered to the plaintiff with regularity in the period extending from May 7, 1946, to November 19, 1946. We mention those facts because they show that when the loggers began to make delivery the plaintiff faced the problem of providing storage space for the logs. The rafts could not be kept at Lyle or Underwood.

The plaintiff had accommodations for only two rafts of logs. Its accommodations were at its mill. Esson Smith, who, as we have said, contracted to take charge of the 200 rafts and bring them to his moorage as they were needed, had facilities at his moorage for no more than 36 rafts. It was not his duty to tow the logs to plaintiff's mill, but only as far as his moorage. Another towboat operator brought the rafts, one at a time, from the moorage to the mill whenever the plaintiff gave orders for him to do so. Smith towed logs for many mills and, hence, could not render all of his space available to the plaintiff's rafts. Further, he confined his operations largely to the part of the river above Vancouver and used his moorage, in part, as a place of delivery of rafts to other carriers who operated below Vancouver. The circumstances just mentioned explain why Smith could not take care of the 64 rafts at his moorage and why he took them across the river to the place where the contested tax was imposed.

The following data, taken from an exhibit prepared by the plaintiff, affords an impression of the length of time each of the rafts remained in Hood River County:

| Herman Creek Raft No. | Date Completed 1946 | Date Into Smith's Stge. 1947 |
|---|---|---|
| L-7 | 5/12 | 4/28 |
| L-9 | 5/20 | 4/9 |
| L-12 | 6/15 | 4/11 |
| U-31 | 5/16 | 4/7 |
| U-35 | 5/20 | 4/7 |
| U-37 | 5/25 | 4/21 |
| U-41 | 5/20 | 4/10 |
| U-42 | 5/31 | 4/21 |
| U-43 | 5/31 | 4/21 |
| U-44 | 6/3 | 4/17 |
| U-45 | 6/4 | 4/14 |
| U-46 | 6/4 | 7/29 |
| U-47 | 6/7 | 3/12 |
| U-48 | 6/7 | 3/7 |
| U-49 | 6/10 | 3/12 |
| U-50 | 6/8 | 3/7 |
| U-51 | 6/17 | 2/20 |
| U-52 | 6/13 | 4/10 |
| U-53 | 6/17 | 4/9 |
| U-54 | 6/15 | 4/9 |
| U-55 | 6/21 | 2/20 |
| U-56 | 6/21 | 2/20 |
| U-57 | 6/20 | 1/18 |
| U-58 | 6/22 | 2/20 |
| U-59 | 6/22 | 2/1 |
| U-61 | 6/26 | 1/18 |
| U-62 | 6/26 | 2/11 |
| U-106 | 9/6 | 1/12 |
| U-107 | 9/7 | 1/12 |
| U-108 | 9/7 | 2/18 |
| U-109 | 9/10 | 2/18 |

| Herman Creek Raft No. | Date Completed 1946 | Date Into Smith's Stge. 1947 |
|---|---|---|
| U-110 | 9/11 | 1/9 |
| U-111 | 9/12 | 1/12 |
| U-112 | 9/16 | 1/12 |
| U-113 | 9/18 | 1/9 |
| U-114 | 9/19 | 1/9 |
| U-115 | 9/20 | 1/9 |
| U-121 | 9/27 | 1/9 |
| U-123 | 10/2 | 1/9 |

| Kellog's Cove Raft No. | Date Completed 1946 | Date Into Smith's Stge. 1947 |
|---|---|---|
| L-3 | 5/7 | 2/15 |
| L-8 | 5/23 | 1/29 |
| L-15 | 6/30 | 1/29 |
| L-17 | 6/27 | 1/29 |
| U-21 | 4/26 | 2/15 |
| U-22 | 4/29 | 2/18 |
| U-23 | 5/1 | 2/15 |
| U-24 | 5/2 | 2/15 |
| U-25 | 5/6 | 2/12 |
| U-26 | 5/10 | 2/4 |
| U-27 | 5/13 | 2/12 |
| U-28 | 5/13 | 2/12 |
| U-29 | 5/14 | 2/15 |
| U-30 | 5/15 | 3/4 |
| U-32 | 5/18 | 2/15 |
| U-33 | 5/18 | 2/12 |
| U-34 | 5/21 | 2/11 |
| U-38 | 5/28 | 2/18 |
| U-39 | 5/29 | 3/4 |
| U-40 | 5/29 | 1/29 |
| U-96 | 8/21 | 2/1 |
| U-141 | 11/6 | 1/23 |
| U-142 | 11/2 | 1/23 |
| U-143 | 11/3 | 1/23 |
| U-145 | 11/19 | 1/23 |

The symbols in the first column identify the rafts. Those which include the letter "L" mean that the raft so designated originated at Lyle, and those which include the letter "U" designate rafts which were made up at Underwood. The second column, headed "Date Completed, 1946" gives the day when each raft was complete and ready for transportation. The uncontradicted testimony shows that a towboat took charge of the rafts within ten days after they were ready for towing. The third column denotes when each raft reached Smith's moorage. To facilitate an understanding of the data in the exhibit, we resort to the first raft entered upon the exhibit, L-7. By glancing at the dates, it will be seen that it was ready for transportation May 12, 1946, but that it did not reach Smith's moorage until April 28, 1947. Thus, eleven months and sixteen days elapsed from the day that raft was ready for a towboat until it reached Smith's moorage. The inference is warranted, we believe, that all of that period, with the exception of about ten days, was spent in Hood River County.

From the testimony of Mr. W. A. Culkin, plaintiff's general manager, we quote:

"Q. Did you know that rafts of Stebco were tied at those two places during parts of 1946 and 1947?

"A. Yes.

"Q. And that they were so tied on January 1st, 1947?

"A. Yes. We knew there were rafts tied there. We didn't know which rafts."

Mr. Smith, referring to the plaintiff, testified:

"The only orders that they give me is to maintain a certain number of rafts in the Vancouver moorage so they can have a backlog to cut on."

By Vancouver moorage he meant the moorage which we have identified with his name. He explained, as we have perhaps sufficiently pointed out, that the reason the 64 rafts were moored in Hood River County was because there were "no facilities in the lower end to handle them." He testified that he was a licensed interstate carrier and charged all shippers he served according to published tariffs. We again quote from him:

"Q. Is it not true these tariffs included both towing and storage service?

THE COURT: That is, in 1946?

MR. WYERS: Yes.

"A. I think that is probably true, that they covered, it covered both. However, there was no division made as to what was storage and what was moorage and which was towing.

\* \* \*

"Q. The arrangement that you had with Stebco was, fundamentally, that Stebco was buying rafts of logs at Underwood and Lyle, in other words, and you were hauling them down as needed, supplying them to this Vancouver moorage, or Smith's moorage, whatever you want to call it, that is located very near their mill at Vancouver in the State of Washington, that you would supply logs there as needed?

"A. That is right.

"Q. But there were a great many more rafts in the river than they needed or could be accommodated at any of their storage facilities, or your storage facility at Vancouver, Vancouver moorage?

"A. That's right.

"Q. You had two hundred rafts in the river at one time, approximately, and only thirty-five or forty of them could be accommodated at the pool near the mill, or at Vancouver, and the rest of them had to be stored or maintained at some places up and down the river; that is correct?

"A. That is right."

No claim is made that the logs were stowed in Hood River County due to lack of transportational facilities upon Smith's part. He accepted each raft promptly when it was ready for a towboat and took it directly to his moorage, if space was available there. If space was lacking there, the raft was taken across the river to the mooring grounds in Hood River County. In short, Smith had ample facilities to transport the rafts. The reason the 64 rafts were moored on the Oregon side of the river was because they had to be stored somewhere and space in Hood River County was available. Expressed otherwise, the reasons were: (1) The plaintiff could not manufacture the logs into lumber as rapidly as Smith could deliver them; and (2) the plaintiff had no place in which to store rafts brought to it in excess of its manufacturing capacity.

■ It is evident that the plaintiff's agreement with Smith called, not only for transportational service, but also for storage service. The latter was as essential to the plaintiff's purposes as the other. The charge which Smith exacted included compensation for his two-fold service. The mere fact that it was represented by a single sum did not refute its two-fold character, for the entire compensation for storage and transportation may be included in a general charge: *Hurd v. Hartford & N. York Steamboat Co.*, 40 Conn. 48.

Had the plaintiff's mill been of greater capacity, or had it not purchased at a single time virtually an entire year's supply of logs, the plaintiff possibly would not have been obliged to store any of the logs. The plaintiff's mill operates throughout the year. In order to maintain constant operations and take advantage of the more favorable price granted to those who make large purchases, the plaintiff did not depend upon

a hand-to-mouth plan of existence, but purchased such a large quantity of logs that it had to secure storage space for 64 rafts. Thus, it is clear that the need for storage was not due to any incidence of transportation but arose out of the fact that through storing some of the rafts the plaintiff could operate its mill more advantageously and more profitably.

The above will suffice as an analysis of the evidence.

██ The plaintiff contends that the log rafts were not taxable by Hood River County, although they were in that county on tax day. Taxation of all property is the general rule and the burden rests upon any owner who claims exemption to prove clearly the exception upon which he depends. In his efforts to establish his claim he is favored by no presumption. To the contrary, the law presumes that all property, such as that before us, is subject to taxation at the place where it was on tax day.

The plaintiff cites the commerce clause of the Federal Constitution (Art. I, Sec. 8) and contends that the 64 log rafts were moving in interstate commerce when the challenged tax was levied January 1, 1947.

█ Yielding effect to the commerce clause, all courts deem immune from local taxation property which is in transit from one state to another. In the application of that rule, difficulty is sometimes encountered in determining the precise time when transit begins or ends. Likewise, as in the present instance, the effect of a pause in transit may prove to be troublesome. The parties concede that an interstate movement began when Smith's towboats took the rafts in charge at the log dumps and, hence, we need spend no time upon

that phase of the movement. Our problem is to determine the effect of the pause. The defendant says that since the pause was for the plaintiff's purposes, that is, storage, it broke the interstate movement and gave the logs a tax situs in Oregon. The plaintiff's brief declares:

"When articles have been started on a journey in interstate commerce and in the course thereof are brought into a state and detained in said state temporarily and for a purpose wholly excluding the idea.of a permanent lodgment or beneficial use of the property in said state, they remain under the protection of the commerce clause of the Constitution and do not acquire a situs in said state for the purpose of taxation."

■ It is, of course, clear that before the 64 rafts were placed at moorage in Hood River County their eventual destination had been determined and that all of them ultimately reached that destination—Smith's moorage. But the mere fact that a destination has been selected before a pause occurs in the interstate movement of goods does not prevent the goods from acquiring a situs for local taxation during the pause: *People v. Bacon,* 243 Ill. 313, 90 N. E. 686, 44 L. R. A. (N. S.) 586, affirmed in 227 U. S. 504, 57 L. Ed. 615, 33 S. Ct. 299, and *General Oil Co. v. Crain,* 209 U. S. 211, 52 L. Ed. 754, 28 S. Ct. 475. In the Bacon case, grain which was enroute through Chicago to its destination was removed from the cars for processing before resuming its transit. The right to remove had been arranged before shipment. The courts held that in its short pause in Chicago the grain acquired a tax situs. In the General Oil Company case, the plaintiff maintained refining plants in Ohio and Pennsylvania and an oil tank in Memphis, Tennessee, which was marked with these

words: "Oil already sold in Arkansas, Louisiana and Mississippi." It placed in that tank oil that had been sold for delivery in the three states just named and which was on its way to its purchasers. During the oil's pause in Memphis it was placed in vessels to meet the requirements of the purchasers. The court held that during the brief interruption of the oil's transit it acquired a tax situs in Tennessee. In both cases the local tax was sustained.

The reason for the interruption in the transit of the logs is determinative of the issue as to whether or not they acquired in this state a situs for taxation purposes. Chief Justice Hughes, in *Minnesota v. Blasius,* 290 U. S. 1, 54 S. Ct. 34, 78 L. Ed. 131, 96 A. L. R. 1, said:

> "The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied."

The plaintiff depends much upon *Champlain Realty Co. v. Brattleboro,* 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309. As stated in *Gulf Refining Co. v. Phillips,* 11 Fed. 2d 967 (writ of certiorari denied in 273 U. S. 697, 47 S. Ct. 93, 71 L. Ed. 845), the decision in the Champlain Realty Company case

> "clearly states the distinction between the arresting of the movement of a commodity in interstate commerce for its safety and protection from dangers due to natural causes to which it is exposed in its journey, and the intentional detention of it for the beneficial purposes of the owner, who did not from the beginning expect it to have an uninterrupted movement to its ultimate destination, but arranged for the halting of it until its further movement could be made to suit his convenience. Such an in-

tentional detention for the purposes just mentioned renders the commodity subject to be taxed at the place where it is stopped.''

In the Champlain Realty Company case, logs destined for New Hampshire were halted immediately above the place in Vermont where the West River empties into the Connecticut. Had they not been detained there before they passed into the Connecticut, the current and high water in the Connecticut would have lost them. That, therefore, is an instance in which the interruption of the movement was due to natural causes.

■■ It is important to take notice fully of the distinction pointed out in the language last quoted. Particularly it is desirable to have in mind that goods, which would otherwise be deemed protected from local taxation by the commerce clause, acquire a local tax situs if their movement is halted ''for the beneficial purposes of the owner, who did not from the beginning expect it to have an uninterrupted movement to its ultimate destination, but arranged for the halting of it until its further movement could be made to suit his convenience.'' We think that the distinction noted in the quoted passage is warranted by all the authorities which have spoken upon the subject and that it is decisive of the case at bar. We will, however, take notice of the additional citations in the plaintiff's brief.

*Multnomah County v. Dant & Russell, Inc.*, 158 Or. 350, 75 P. 2d 986, and *Von Hamm-Young Co. v. San Francisco*, 29 Cal. 2d 798, 178 P. 2d 745, 171 A. L. R. 274, are instances of break in transit due to lack of shipping facilities. Obviously, in cases of that kind the interruption does not negative the interstate character of the movement. *Carson Petroleum Company v.*

*Vial,* 279 U. S. 95, 49 S. Ct. 292, 73 L. Ed. 626, reached the same result under facts different in kind but not in substance.

*Coe v. Errol,* 62 N. H. 303, affirmed in 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715, was concerned with the movement of logs. When the case was before the New Hampshire court it involved two quantities of logs, both of which on tax days were in the defendant municipality and both of which were assessed by it. The one quantity was lying in the dry bed of the Androscoggin River which passes through Errol. That quantity had been placed in the river in Maine and was destined to a point below Errol. The New Hampshire decision pointed out that those logs "remained here no longer than was necessary under the circumstances," and held that since the absence of sufficient water in the river was responsible for the interruption in the movement of the logs, the latter were not taxable. The other quantity of logs had not yet reached the river, and the decisions, both by the New Hampshire court and the United States Supreme Court, are much cited in cases concerned with the problem as to whether or not transit has begun. Both decisions held that the logs had not entered the channels of commerce on the day the tax was levied.

*Connecticut River Lumber Co. v. Columbia,* 62 N. H. 286, held immune from New Hampshire taxation logs which had been cut in Vermont and which were destined for Connecticut. On tax day they were lying on the New Hampshire side of the Connecticut River in its ice-covered surface. The decision held that their interstate movement had begun before the tax was levied.

Those are the authorities upon which the plaintiff

depends. We do not think that they support its position. This is not an instance in which the interruption to the movement of the rafts was due to natural causes or lack of towboat facilities. Had the plaintiff been prepared to receive the rafts, their movement would have gone through without hindrance. The sole and only reason why the transit met with arrestment was because the plaintiff wished it to be so. It arranged from the very outset for stoppage and storage as well as transportation. Paraphrasing the quotation set forth in a preceding page, this is an instance of the intentional detention of the rafts for the beneficial purposes of the plaintiff which did not from the beginning expect the rafts to have an uninterrupted movement to their ultimate destination, but arranged for the halting until the rafts' movement could be made to suit the plaintiff's convenience.

*Burlington Lumber Co. v. Willetts,* 118 Ill. 559, 9 N. E. 254, passed upon a set of facts almost the counterpart of those before us. That case, like the present one, was a suit to enjoin the collection of a tax which had been levied upon some rafts of logs. The owner of the latter operated a sawmill at Burlington, Iowa, on the Mississippi River. The tax was levied by the assessor of New Boston, Illinois, while the logs were at that place. New Boston is on the Illinois side of the Mississippi about thirty miles above Burlington. The logs had been cut in Wisconsin and were towed down the river. For nine years the plaintiff had kept rafts at New Boston until its mill had need for them. On the plaintiff's behalf, one of its witnesses testified: "Some of the logs were stopped on the way. We could not stow all we bought, at or near Burlington." That explanation, it will be noted, is the same as the one

given by the witnesses in the instant case. The plaintiff paid the owner of the adjacent land at New Boston for shore privileges, and maintained a watchman to guard the rafts. When the mill needed a raft, one was brought from New Boston. The plaintiff in that case, like the present one, argued that the logs were "in transitu, and, therefore, not taxable in this State." The court, in rejecting that contention, said:

> "New Boston harbor, or Sturgeon bay, as it is usually called, is only thirty miles up the river from Burlington. It is very accessible, and it seems plain that the company had selected the bay as a place of storage for its logs—a place where the property could be shipped, and kept in safety until such time as it was needed at the mills in Burlington. Indeed, for all practical purposes, it may be said that the transit of the property ended at New Boston. When the logs reached that point, they were located there for an indefinite time. New Boston harbor thus became the destination of the property, and so remained until such time as the corporation saw proper again to place the property in transit. No other reasonable construction can be placed upon the evidence."

The only details in which the facts of that case differ from those before us are that the owner in that case (1) paid for the shore privileges, and (2) maintained a watchman to guard the rafts. We deem those differences immaterial to the issues before us.

As we have pointed out, the cause, occasion and purpose of the interruption in the transit of property which, it is claimed, gave the property a situs in the taxing unit, are highly important. We repeat that the moorage of the logs in Hood River County was intended to serve only one purpose: the interests of the plaintiff. It may be that when the plaintiff and

Mr. Smith arranged for the latter's services, they did not designate Herman's Creek and Kellog's Cove as the places where the rafts should be stowed; nevertheless, it is a fact that they agreed that many of the rafts should be moored and stored until the plaintiff was ready to use them. Thus, it was never intended that all of the rafts should move without pause from the place of origin to Smith's moorage at Vancouver. At the very outset it was agreed that the immediate destination of many of the rafts should be an intermediate moorage basin, to be selected by Smith. Moreover, after the Hood River moorages had been made, the plaintiff was apprised of the fact and was told where its rafts were located.

When the plaintiff instituted this suit, it assumed the burden of proving that the rafts in question were in transit on tax day, January 1, 1947. If unable to prove that the rafts were in actual movement, it was its duty to prove that the stoppage was due to lack of transportational facilities or resulted from natural causes. We do not believe that it sustained the burden of proof. We are satisfied that the stoppage was due solely to the fact that the plaintiff itself wanted the logs detained where they were.

The assignments of error are sustained. The court erred in entering the attacked decree. It should be vacated and the suit dismissed.